Floyd T. BRYAN; Floyd T. Bryan, M.D., P.A., Plaintiffs–Appellees, Cross–Appellants,

v.

JAMES E. HOLMES REGIONAL MEDICAL CENTER, a/k/a Holmes Regional Medical Center, Inc., Defendant–Appellant, Cross–Appellee,

Raymond A. Armstrong, M.D., individually and as Chairman, Department of Surgery, HRMC and as Member of the Board of Directors, HRMC; Richard N. Baney, M.D., individually and as Member of the Board of Directors, HRMC; Michael J. Foley, M.D., individually and as Medical Director, HRMC; Michael V. Gatto, individually and as Member of the Board of Directors, HRMC; James E. Gray, III, individually and as Secretary of the Board of Directors, HRMC; Joseph A. Gurri, M.D., individually and as Chief of the Medical Staff, HRMC; Martin W. Isenman, M.D., individually and as Member of the Board of Directors, HRMC; David M. Jones, Maj. Gen. (Retired), individually and as Treasurer of the Board of Directors, HRMC; Michael F. Maguire, individually and as Member of the Board of Directors, HRMC; Fred L. McFarlin, individually and as Member of the Board of Directors, HRMC; John E. Miller, Ph.D., individually and as Second Vice Chairman of the Board of Directors, HRMC; Barry A. Mills, M.D., individually and as Chairman, Executive Committee, HRMC; Lyle Saltzman, M.D., individually and as Member of the Executive Committee, HRMC; Val M. Steele, individually and as Member of the Board of Directors, HRMC; Lynn Stoldt, R.N., individually and as Head Operating Room Nurse, HRMC; Russell P. Sullivan, Jr., individually and as Chairman of the

Board of Directors, HRMC; John F. Turner, Jr., individually and as First Vice Chairman of Board of Directors, HRMC; Rita Wheeler, R.N., individually and as Operating Room Supervisor, HRMC, Defendants.

No. 92–2963.

United States Court of Appeals, Eleventh Circuit.

Oct. 4, 1994.

Christopher K. Kay, Foley & Lardner, Orlando, FL, Sylvia H. Walbolt, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, St. Petersburg, FL, Alan C. Sundberg, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tallahassee, FL, for James E. Holmes.

Jennifer S. Carroll, Metzger, Sonneborn & Rutter, PA, West Palm Beach, FL, George H. Moss, Moss, Henderson, Van Gaasbeck, Blanton & Koval, PA, Vero Beach, FL, Larry Klein, Klein & Walsh, PA, West Palm Beach, FL, for Floyd T. Bryan.

Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and DYER, Senior Circuit Judge.

TJOFLAT, Chief Judge:

In this case, a Florida hospital, after completing a lengthy internal disciplinary process, terminated the clinical staff privileges of a staff physician. The physician sued the hospital, alleging various state and federal causes of action and seeking money damages. After an eleven-day trial, a federal jury concluded that the hospital had revoked the physician's staff privileges in violation of its bylaws and awarded the physician nearly $4.2 million in damages for breach of contract. The hospital appeals that judgment as well as the district court's denial of its post-trial motion for judgment as a matter of law, which contended that the hospital was immune from liability in money damages under the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. §§ 11101–11152 (1988 & Supp. IV 1992), and under Florida law, Fla.Stat.Ann. § 395.0193(5) (West 1993). Because we conclude that the hospital was entitled to protection from monetary liability under HCQIA, we reverse.

## I.

Peer review, the process by which physicians and hospitals evaluate and discipline staff doctors, has become an integral component of the health care system in the United States. Congress enacted the Health Care Quality Improvement Act to encourage such peer review activities, "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 903, 99th Cong., 2d Sess. 2, *reprinted in* 1986 U.S.C.C.A.N. 6287, 6384, 6384. Congressional findings, recited in the text of the statute itself, note that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care have become nationwide problems that warrant greater efforts than those that can be undertaken by any individual State," 42 U.S.C. § 11101(1), and that these problems "can be remedied through effective professional peer review," *id.* § 11101(3). In furtherance of this goal, HCQIA grants limited immunity, in suits brought by disciplined physicians, from liability for money damages to those who participate in professional peer review activities. *Id.* § 11111(a).

Prior to the passage of HCQIA, the specter of litigation seriously impeded the development and vigorous enforcement of hospital peer review procedures. Congress found that "[t]he threat of private money damage liability under [state and] Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review." *Id.* § 11101(4).[1] Accordingly, HCQIA provides that, if a "professional review action" (as defined in the statute) meets certain due process and fairness requirements, then those participating in such a review process shall not be liable under any state or federal law for damages

---

1. *See also* H.R.Rep. No. 903, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6385 (noting that "[e]ven though defendants may often win these lawsuits, that may not be sufficient to guarantee enthusiastic, or even minimally adequate, peer review" because "[d]octors who are sufficiently fearful of the threat of litigation will simply not do meaningful peer review").

for the results. *Id.* § 11111(a)(1). Thus, "[d]octors and hospitals who have acted in accordance with the reasonable belief, due process, and other requirements of [HCQIA] are protected from damages sought by a disciplined doctor." H.R.Rep. 903, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6385.

HCQIA is designed to facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits.[2] The statute attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action; accordingly, Congress granted immunity from monetary damages to participants in properly conducted peer review proceedings while preserving causes of action for injunctive or declaratory relief for aggrieved physicians. Because the statutory scheme is somewhat convoluted, we discuss the immunity provisions in detail.[3]

The provision of HCQIA that limits the availability of damages for professional review actions provides as follows:

> If a professional review action (as defined in ... this title) of a professional review body meets all the standards specified in section 11112(a) of this title, ...
>
> (A) the professional review body,
>
> (B) any person acting as a member or staff to the body,
>
> (C) any person under a contract or other formal agreement with the body, and
>
> (D) any person who participates with or assists the body with respect to the action,
>
> shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

42 U.S.C. § 11111(a)(1).[4] The standards that professional review actions must satisfy to

---

**2.** In another set of provisions, HCQIA requires health care entities to report certain specific disciplinary actions taken against a staff physician (or the acceptance of a resignation or suspension in return for not conducting investigations or disciplinary proceedings) to a national clearinghouse established to collect and disseminate information on health care providers. 42 U.S.C. §§ 11133–34. Then, prior to admitting a physician to its staff, a hospital must obtain that physician's records from the clearinghouse. *Id.* § 11135. These reporting requirements were designed to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." *Id.* § 11101(2) (reciting congressional findings). Congress recognized that physicians faced with disciplinary action, no longer able to hide their previous discipline, would feel compelled to challenge any action taken against them in the courts. *See* H.R.Rep. No. 903, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6385. Accordingly, the reporting requirements increased the need to protect peer review participants from liability.

The Secretary of Health and Human Services may, following an investigation, publish in the Federal Register the name of a health care entity that has failed to comply with these reporting requirements; a hospital so identified then loses the protection of HCQIA immunity provisions for three years. 42 U.S.C. § 11111(b).

**3.** It is important to note that we use the term "immunity" here in a limited sense. *See* H.R.Rep. No. 903, at 3, *reprinted in* 1986 U.S.C.C.A.N. at 6385. HCQIA establishes an immunity only from liability for money damages,

not a right to avoid standing trial. As the Tenth Circuit has concluded, "[t]he plain meaning of [42 U.S.C. § 11111(a)(1)] is that professional review bodies and covered individuals who satisfy the requirements of § 11112(a) are immune from liability only. On its face, the provision does not explicitly establish immunity from suit." *Decker v. IHC Hosps., Inc.,* 982 F.2d 433, 436 (10th Cir.1992) (footnote omitted) (holding that motions to dismiss based on HCQIA immunity are not immediately appealable), *cert. denied,* —— U.S. ——, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993); *accord Manion v. Evans,* 986 F.2d 1036, 1042 (6th Cir.1993).

This reading of the statute comports with the legislative history surrounding its adoption. According to the report of the House Committee on Energy and Commerce:

> Initially, the Committee considered establishing a very broad protection from suit for professional review actions. In response to concerns that such protection might be abused and serve as a shield for anti-competitive economic actions under the guise of quality controls, however, the Committee restricted the broad protection. As redrafted, the bill now provides protection only from damages in private actions, and only for proper peer review, as defined in the bill.

H.R.Rep. No. 903, at 9, *reprinted in* 1986 U.S.C.C.A.N. at 6391.

**4.** Section 11111(a)(1) expressly excludes from its coverage suits brought under 42 U.S.C. § 1983 or Title VII of the Civil Rights Act of 1964, but it clearly *does* apply to antitrust claims. *See Pat-*

entitle the participants to such protection are enumerated in section 11112(a) as follows:

> For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—
>
> (1) in the reasonable belief that the action was in the furtherance of quality health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*Id.* § 11112(a). Importantly, HCQIA also creates a rebuttable presumption of immunity: "A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." *Id.*

Section 11112(b) of HCQIA then enumerates the minimum, or "safe harbor" procedures that will, in every case, satisfy the adequate notice and hearing requirement of section 11112(a)(3). *Id.* § 11112(b). Organized in the form of a detailed checklist, the provision defines what hospitals conducting peer review disciplinary procedures must do to obtain the Act's protections for itself and the members of its peer review bodies. We discuss this checklist in more detail *infra* in part III. Congress was careful to explain, however, that "[a] professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute

failure to meet the standards of subsection (a)(3) of this section." *Id.*

The legislative history of section 11112(a) indicates that the statute's reasonableness requirements were intended to create an objective standard of performance, rather than a subjective good faith standard. As the House Committee on Energy and Commerce explained:

> Initially, the Committee considered a "good faith" standard for professional review actions. In response to concerns that "good faith" might be misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action, the Committee changed to a more objective "reasonable belief" standard. The Committee intends that this test will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.

H.R.Rep. No. 903, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6392–93. *See Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir.1992) (holding that HCQIA reasonableness requirements create an objective standard, rather than a good faith requirement).

A review of the facts of this case reveal that HCQIA's limitations on monetary liability dictate the outcome of this appeal.

## II.

The appellant, Holmes Regional Medical Center ("Holmes" or "the Hospital"), is a nonprofit corporation operating a private hospital in Melbourne, Florida. The appellee, Dr. Floyd T. Bryan, is a board-certified physician who specializes in general and vascular surgery.[5] Bryan became a member of the Holmes medical staff in 1976; he is gen-

---

*rick v. Burget,* 486 U.S. 94, 105 n. 8, 108 S.Ct. 1658, 1665 n. 8, 100 L.Ed.2d 83 (1988). The section states, however, that "[n]othing in this paragraph shall prevent the United States or any Attorney General of a State from bringing an action, including an action under [section 4C of the Clayton Act, 15 U.S.C. § 15C], where such an action is otherwise authorized." 42 U.S.C. § 11111(a)(1). And HCQIA "does not restrict the rights of physicians who are disciplined to

bring private causes of action for injunctive or declaratory relief." H.R.Rep. No. 903, at 9, *reprinted in* 1986 U.S.C.C.A.N. at 6391.

**5.** The appellees are Bryan and his professional organization, Floyd T. Bryan, M.D., P.A. We refer to them collectively as "Bryan" for convenience.

erally acknowledged to be an excellent surgeon, often undertaking long, detailed vascular procedures that other physicians in the field avoid. Bryan also has a reputation for being a volcanic-tempered perfectionist, a difficult man with whom to work, and a person who regularly viewed it as his obligation to criticize staff members at Holmes for perceived incompetence or inefficiency. Hospital employees, however, often viewed Bryan's "constructive criticism" as verbal—or even physical—abuse. Because the Holmes board of directors found Bryan's behavior inappropriate and unprofessional, it terminated his medical staff privileges in November 1990. The means by which Holmes accomplished this termination is the subject of the dispute in this case.

## A.

The organizational structure at Holmes, as is the case at most hospitals, is bifurcated, reflecting the distinct roles of the Hospital administration and of the medical staff. Holmes is governed by a board of directors, comprised mostly of non-physicians, that retains the ultimate responsibility for the operation of the facility. The board employs a staff, led by a president and chief executive officer ("CEO"), to manage the hospital on a day-to-day basis. The medical staff organization, which consists of all doctors with privileges to practice at Holmes, represents the physicians in the Hospital's government. The medical staff is led by an elected chief of staff who presides over the medical executive committee, which comprises the chairpersons of the various clinical departments as well as several officers elected by the staff at large.

The Holmes board of directors promulgates bylaws for the medical staff, by which all physicians receiving staff privileges at the Hospital agree to be bound. The bylaws provide a detailed series of procedures for handling physician disciplinary actions. Under those bylaws, the medical staff, through its executive committee, may recommend that the board of directors suspend or revoke the privileges of a physician. Although the board retains the ultimate authority over staff privileges, the recommendations of the medical staff are given considerable weight. This system, which is known as peer review, is designed to raise the quality of medical care by encouraging physicians to police themselves. Florida law mandates that hospitals provide for peer review of their staff doctors.[6]

Under the Holmes bylaws, certain hospital officials may request an executive committee investigation[7] into a physician's conduct if the medical staff member fails to comply with the ethics of the medical profession or with the Hospital's bylaws, or if "the Staff appointee is unable to work harmoniously with others to the extent that it affects the orderly operation of the hospital or Medical Staff organization." Grounds for investigation also include questions regarding a physician's clinical competence or his care and treatment of patients.

Once an investigation is initiated, the executive committee is charged with making a recommendation to the board of directors concerning the level of discipline that should be imposed.[8] The executive committee's recommendation may range from a written warning to revocation of clinical privileges, but a recommendation involving the reduc-

---

**6.** See Fla.Stat.Ann. § 395.0193(2) (West 1993) ("Each licensed [health care] facility, as a condition of licensure, shall provide for peer review of physicians who deliver health care services at the facility.").

**7.** Investigations may be requested, according to the bylaws, by various officers of the medical staff, including the chairpersons of various committees and clinical departments. Such requests must be made in writing to the executive committee and must refer to the specific conduct that constitutes the basis for the request.

**8.** All or part of the physician's privileges may be suspended temporarily pending the outcome of

the inquiry. The relevant provision of the bylaws provides:

> At any time during the investigation, the Executive Committee or the Medical Staff President or his designee may suspend all or any part of the clinical privileges of the individual being investigated. This suspension shall be deemed to be administrative in nature, for the protection of hospital patients. It shall be in effect during the investigation only, shall not indicate the truth of the charges, and shall remain in force, without appeal, during the course of the investigation.

tion, suspension, or revocation of clinical privileges entitles the physician to the extensive procedural hearing rights outlined in the bylaws. The executive committee's recommendation is forwarded to the CEO of the hospital, who notifies the physician under scrutiny. The physician has twenty days from receipt of the notice to make a written request for a hearing. If the physician waives his or her right to a hearing, the CEO forwards the recommendation (along with the supporting documentation) to the board of directors for a final disposition of the matter.[9]

When a physician requests a formal hearing, the executive committee appoints a hearing panel consisting of seven members of the medical staff who have not taken active part in consideration of the matter contested; mere knowledge of the matter does not preclude a staff member from serving on a hearing panel. According to the bylaws, "[t]he purpose of the hearing shall be to recommend a course of action to those acting for the hospital.... [T]he duties of the Hearing Panel shall be so defined and so carried out."

The medical staff bylaws contain detailed procedures governing the hearing process, including provisions for written notice of the time and place for the hearing, prompt scheduling, and lists of witnesses. The physician requesting the hearing is entitled to representation, and has full rights of cross-examination and confrontation of witnesses. The executive committee designates someone, who may be an attorney, to present the disciplinary recommendation that led to the hearing and to examine witnesses. In addition, the CEO appoints a hearing officer, who must be an attorney, to preside over the hearing and to rule on the admissibility of evidence; the hearing officer must not act as a prosecuting officer or as an advocate for the hospital. The bylaws recognize that all members of the hearing panel, as practicing physicians, cannot be present for all panel sessions and expressly provide that their absence will not disqualify them or invalidate the hearing.

The decision of the hearing panel is to be based on the evidence produced at the hearing, whether in the form of oral testimony of witnesses or documentary evidence. The bylaws specifically provide that the evidence may include "any material contained in the hospital's files regarding the [complained-against physician] who requested the hearing so long as this material has been admitted into evidence at the hearing and the [physician] who requested the hearing had the opportunity to comment on and, by other evidence, refute it." The "burden of proof" is established as follows: "[T]he Hearing Panel shall recommend against the [physician] who requested the hearing unless it finds that said [physician] has proved that the recommendation which prompted the hearing was unreasonable, not sustained by the evidence, or otherwise unfounded."

After reaching a decision, the hearing panel is to "render a recommendation, accompanied by a report, which shall contain a concise statement of the reasons justifying the recommendation made...." The report is then forwarded to the executive committee for whatever modification, if any, it may wish to make in its original recommendation. The executive committee's decision on modification is purely discretionary.

Within fifteen days after the affected physician is notified of final adverse action by the executive committee, the doctor may make a written request for appellate review by the board of directors. If appellate review is not requested within the fifteen-day period, the affected individual is deemed to have accepted the recommendation involved

---

9. The procedure is slightly different when the executive committee settles on a less severe form of discipline. If the action of the executive committee does not involve the reduction, suspension, or revocation of staff privileges, the bylaws provide that "it shall take effect immediately without action of, and without the right of appeal to the Board." A report of the action is sent to the board, which may modify the executive committee's decision on its own initiative. Should the board decide to reject a favorable recommendation by the executive committee and impose a more severe form of discipline that involves the suspension or revocation of clinical privileges, however, the physician would then be entitled to a hearing (according to the same procedures) before the board enters a final decision.

"and it shall thereupon become final and immediately effective." The terms of the bylaws limit the grounds upon which an adverse disciplinary recommendation may be appealed to the following:

[1] there was substantial failure on the part of the Executive Committee or Hearing Panel to comply with the hospital or Medical Staff Bylaws in the conduct of hearings and recommendations based upon hearings so as to deny due process or a fair hearing; or

[2] the recommendation was made arbitrarily, capriciously, or with prejudice; or

[3] the recommendation of the Executive Committee or Hearing Panel was not supported by the evidence.

Under time constraints imposed by the bylaws, the chairman of the board appoints a board review panel (consisting of three or more persons, including board members or "reputable persons outside the hospital") to consider the record upon which the disciplinary recommendation was made. The review panel may accept additional evidence, subject to the same procedural guarantees that apply to hearing panels, and both sides have an opportunity to present arguments. The review panel then recommends action to the full board.[10]

The board of directors may affirm, modify, or reverse the recommendations of either the appellate review panel or the executive committee, or, in its discretion, refer the matter for further review and recommendation.[11] When made, the board's ultimate decision is final, immediately effective, and is not subject to further review under the bylaws.

10. If the board's review panel recommends action to the board that is contrary to the recommendation of the medical staff, and if a physician's privileges are at issue, then the matter is first reviewed by a joint conference committee, comprised of members of the board and the medical staff, before the board makes a final decision.

11. The medical staff bylaw that contains this provision does not indicate to whom the board may "refer the matter for further review."

B.

Bryan's disciplinary problems began shortly after he arrived at Holmes in 1976, and they continued throughout his tenure at the Hospital. Indeed, prior to his termination, Bryan was the subject of more than fifty written incident reports involving unprofessional or disruptive behavior, usually complaints regarding Bryan's abusive treatment of nurses, technicians, and even fellow physicians.[12] By December 1987, nurses in the intensive care unit at Holmes were refusing to care for Bryan's patients on anything but a rotating basis for fear of becoming the object of his volcanic temper. For their part, surgical nurses complained that Bryan's verbal abuse compounded an already stressful environment, precluding them from operating at peak performance.

At trial in this case, numerous employees who had either witnessed or suffered his outbursts described Bryan's temperament; he was characterized as being "brutal" and "sharp" with subordinates, as engendering fear in the nursing staff, and as promoting a tense working atmosphere. Bryan admitted both during the Holmes disciplinary process and at trial in federal court that he had a problem with his temper and that his behavior had, at times, been "disruptive" and "unprofessional." He also conceded that the incident reports describing his behavior were not fabrications.

At first, the Hospital and the medical staff attempted to deal with Bryan's behavior informally. Bryan's conduct was the subject of periodic meetings and counseling by the executive committee, the chief of the medical staff, and even the CEO of the hospital. The Hospital repeatedly warned Bryan that his confrontations with staff members could not

12. Some insight into the origins of this behavior came from Bryan himself during his testimony at trial. Shortly after completing his residency, Bryan obtained staff privileges at a Veterans Administration hospital in Miami. There, he explained, he soon learned that the hospital could not fire incompetent nurses and other technicians easily; the most effective way to avoid working with nurses he viewed as incompetent or inefficient, he discovered, was to insult them until they refused to participate in operations involving his patients.

be tolerated and insisted that he correct his disruptive behavior. In 1985, Bryan agreed to take a voluntary leave of absence and to seek counseling, first with his priest and then with a psychiatrist (who prescribed a number of medications) to control his temper.

The incidents continued unabated, however, over the next three years, and Hospital officials gradually began to take a more active approach in dealing with the problem. In August 1987, a group of three Holmes officials—the Hospital's CEO, the chief of the medical staff, and the chairman of the department of surgery—advised Bryan that he would be brought before the executive committee for consideration of formal disciplinary action if further incidents occurred. Following additional incident reports detailing a continued behavioral pattern, the executive committee appointed an ad hoc committee "to investigate Dr. Bryan's long term pattern of behavior and look into rehabilitative possibilities and make a recommendation to the Executive Committee." In March, the ad hoc committee recommended that any future problems be the subject of graduated suspensions, beginning with a one-week suspension for the next significant incident. The executive committee agreed to this proposal and informed Bryan in writing of its decision that any further incidents would result in disciplinary action of increasing severity. According to the minutes from the executive committee's March 14, 1988, meeting, "[t]he Committee felt that such specific guidelines would be an appropriate mechanism to help Dr. Bryan improve his behavior." Bryan did not contest this action.

In April 1988, just one month after the executive committee's warning concerning graduated discipline, Bryan had an angry exchange with two anesthesiologists when an operation began three minutes behind schedule. When the anesthesiologists attempted to explain why they were taking a few minutes to reexamine the patient's medical records before administering the anesthesia to the patient on the operating table, Bryan told them that he "didn't give a damn about incompetent people's excuses." According to the anesthesiologists, he then launched into a tirade of insults in loud and angry tones in front of the still-conscious patient.

The executive committee recommended a one-week suspension as a result of the incident with the anesthesiologists; Bryan again accepted the punishment without objection. Yet Bryan's problems with his colleagues continued. In October 1988, for example, Bryan falsely reported to a nurse supervisor that one of her patients had just hanged himself in his room; in fact, the patient was fine. At trial, Bryan explained that he had intended the episode as a "joke" to teach the nurse "responsibility." After additional incidents during the fall of 1988, the executive committee met to consider disciplinary action. Bryan was invited to this meeting, but he did not appear because, due to a miscommunication, he was waiting in his office to be called. The executive committee reviewed the recent incident reports and, concluding that they included at least two new significant episodes, recommended a four-week suspension.[13]

At this point, Bryan for the first time invoked his procedural rights under the bylaws, requesting that a peer review hearing panel evaluate the executive committee's recommendation. Bryan was represented by counsel at the proceedings, over which Dr. Dale Ryon presided. The Ryon panel concluded that Bryan had in fact done the things alleged and that Bryan's actions were inappropriate. Nevertheless, it recommended that no suspension be imposed. In its report, the panel expressed concern that the subcommittee monitoring Bryan's behavior had not discussed the incident reports with Bryan before making a recommendation to the executive committee, and that the executive committee had recommended a four-week suspension without hearing from Bryan (as a result of the misunderstanding about the meeting). Further, the Ryon panel suggested that the Hospital's incident report system as a whole was flawed because a report might be filed without the affected individual having a contemporaneous oppor-

13. Under the bylaws, Bryan's presence was not required at this stage of the proceedings.

tunity to respond.[14]

After receiving the Ryon panel's report, the executive committee modified its original disciplinary recommendation, reducing the suggested suspension from four weeks to two. Bryan appealed the executive committee's recommendation to the board of directors, which decided that no suspension would be imposed. On October 19, 1989, however, the board advised Bryan by letter that his abusive behavior could no longer be tolerated and that any further incidents of unprofessional behavior would result in the permanent revocation of his staff privileges. Bryan acknowledged the board's conditions by signing this "ultimatum" letter on December 19, 1989. Above his signature, however, Bryan referred the board to his letter of December 13, in which he disputed that his behavior was disruptive and stated that, by signing the board's letter, he was not waiving his "rights to due process of law or other civil rights as a medical staff member and American citizen."

Despite the board's warning, Bryan was involved in four additional incidents in the first five months of 1990; these four incidents led directly to the termination of Bryan's medical staff privileges. First, surgical technologist Tina Stark filed an incident report stating that, on March 7, Bryan slapped her hands—apparently as a reprimand for a perceived mistake in handling a catheter—while she was assisting him in an operation. On April 9 and 16, 1990, the executive committee held meetings concerning the Stark incident and interviewed the various nurses and physicians who witnessed the events. Given Bryan's past pattern of conduct, the executive committee recommended that Bryan's privileges be suspended for two weeks. Bryan requested a peer review hearing. Before a hearing panel could

be appointed, however, Bryan was involved in a second physical incident. On May 16, 1990, while nurse Michael Greene assisted Bryan on an operation, Bryan struck Greene's hands with a surgical instrument; Greene claimed that his hand hurt for several minutes afterwards.

During the same period, Bryan twice ordered the wrong patient prepared for surgery, first in March of 1990 and then in May. On both occasions, the mistake was caught by another physician after the patient had been transferred to the surgical intensive care unit in advance of the operation.

On May 29, 1990, the executive committee convened to interview the witnesses to the four recent incidents.[15] Bryan presented his version of events to the committee: He attributed what were perceived as slaps to the hands of the nurses as a form of "nonverbal communication" (the use of hand motions by a physician to give directions during surgery) to correct the nurses' mistakes; similarly, although he admitted the misdirections of the patients for surgery, he minimized these mistakes because they were detected in time and no harm had come to the individuals involved. After considering these latest incidents in light of Bryan's history of disruptive behavior and the hospital's varied attempts to correct such behavior—as well as the board's explicit warning a few months before that further unprofessional conduct would result in Bryan's dismissal—the executive committee recommended that Bryan's staff privileges be permanently revoked.

Once again, Bryan requested that a peer review hearing panel be appointed. Chaired by Dr. Joseph Chanda, the panel consisted of seven physicians, none of whom were vascular surgeons.[16] The Chanda panel held four

---

14. In response to this criticism, the incident report system at Holmes was changed to ensure that copies of all incident reports would be provided to the subject soon after they were filed.

15. By letter dated May 18, 1990, Dr. Barry Mills, the chief of the medical staff, suspended Bryan's clinical privileges pending an investigation into these matters. This suspension was considered administrative in nature; under the bylaws, Bryan was allowed to continue to care for pa-

tients already admitted to the Hospital, but he could not admit any additional patients.

16. The hearing panel members were appointed by Dr. Mills with the approval of the executive committee. Bryan challenged the initial composition of the panel, alleging bias on the part of Dr. William Broussard, who advised Bryan to seek counseling for his interpersonal problems in 1982. Bryan also contended that the panel should be composed solely of surgeons. In response to Bryan's objections, Mills selected a

sessions of hearings; Bryan was represented by counsel at the proceedings, and he had both the opportunity to cross-examine the witnesses offered by the medical staff and to present witnesses and documentary evidence on his own behalf. A court reporter recorded the testimony at all of the hearing sessions. Two panel members were absent from at least part of the hearings, but Chanda testified at trial that the panel as a whole reviewed the testimony orally at the end of each session and during deliberations and that summarized what had transpired for the absent members.

The Chanda panel heard the testimony of a number of witnesses, including those directly involved in the four most recent incidents. Bryan himself testified as well, explaining that all of his actions at the Hospital had been motivated by his concern for the care of his patients. The panel also considered the earlier incident reports in Bryan's file that had formed the basis for the board's warning to that any additional disruptive behavior would result in the termination of Bryan's privileges.[17]

Much of Bryan's defense was focused on a disparate treatment argument: Bryan contended that he had been written up for minor incidents that would have been ignored had they involved any other doctor on the Holmes staff. Bryan also argued that his temper was not disruptive, and that many other physicians at the Hospital had similar or worse temper problems. He further suggested that the disciplinary action was motivated principally by personal animosity on the part of hospital administrators and executive committee members.

After considering the evidence presented, the Chanda panel unanimously found that the most recent incidents, which prompted the executive committee's investigation and disciplinary recommendation, "were amply supported by the record" and violated the admonitions in the board's October 19, 1989, "warning" letter. The panel also concluded that Bryan had demonstrated a pattern of disruptive behavior extending over many years. Because "the hospital behavior of [Bryan was] below acceptable standards and adversely impact[ed] upon patient care and adversely affect[ed] Hospital Staff's ability to deliver quality patient care," the panel recommended that Bryan's clinical privileges be suspended for two years.

After considering the Chanda panel's report, the executive committee stood by its recommendation that Bryan's staff privileges be revoked. Bryan appealed the executive committee's recommendation to the board of the directors; pursuant to the bylaws, the board appointed a board review panel, which also recommended revocation of Bryan's clinical privileges. The full board then considered the three recommendations—the report of the executive committee recommending termination of Bryan's clinical privileges, the report of the Chanda panel recommending that Bryan be suspended for two years, and the report of the board's own review panel recommending termination.[18] In November

new panel member to replace Broussard but did not remove the non-surgeons who had previously been named. As provided by the bylaws, none of the panel members were vascular surgeons (Bryan's direct economic competitors). Bryan did not object to the reconstituted hearing panel.

17. During the Chanda panel proceedings, the medical staff attempted to introduce all of the prior incident reports involving Bryan's behavior to demonstrate the pattern of misconduct that had led to the board's warning regarding termination of privileges. The hearing officer refused to admit those reports into evidence. On the last day of the proceedings, however, Bryan called Dr. Ryon to testify regarding the earlier incident reports that his panel had considered; Bryan attempted to elicit testimony that there was no pattern of inappropriate conduct by Bryan. Because Bryan had brought the earlier incident reports into issue, the Chanda panel asked the hearing officer *sua sponte* to review the reports, which he allowed at the last session of the hearings. Although Bryan complained that the reports should not be reviewed at that late stage of the proceedings, he did not formally object, assert a violation of the Hospital's bylaws, or ask to reopen the hearing to present evidence in rebuttal. Several Holmes officials who testified at trial agreed that Bryan could have requested a postponement to prepare a response if he was concerned about these last-minute developments.

18. Bryan has repeatedly emphasized that the board members did not themselves read the complete transcript of the Chanda panel proceedings before reaching the decision to terminate Bryan's privileges. Bryan, however, had the opportunity to obtain a copy of the transcript of the hearings

1990, the board unanimously voted to terminate Bryan's clinical privileges at Holmes. Members of the executive committee and the board who testified at trial agreed that the disciplinary action was taken after a reasonable effort to obtain the facts and in the reasonable belief that the severe sanction was imposed on Bryan in furtherance of quality patient care at Holmes.

Throughout the disciplinary process, neither Bryan nor the expert witnesses who testified on his behalf contended that the various incident reports that formed the basis for the disciplinary action were fraudulent fabrications. Indeed, Bryan himself admitted that, in each instance, some sort of interaction occurred between himself and the author of the incident report. Bryan merely disagreed both with the Hospital's judgment concerning the propriety of his conduct and the severity of the sanction imposed.

### C.

On December 5, 1990, in the United States District Court for the Middle District of Florida, Bryan filed a complaint on behalf of himself and his professional association against the Hospital, the individual members of its board of directors, members of the medical staff executive committee, and two nurses. The complaint included federal and state antitrust claims as well as state law claims for defamation, negligent supervision

of the peer review process (against only the individual members of the board of directors), and breach of contract for failing to follow the medical staff bylaws during the disciplinary process (against the Hospital).[19] The complaint demanded damages and, only with respect to the count of negligent supervision, injunctive relief. The central allegation in the complaint was that the defendants, "individually and in concert, acted in bad faith and with intentional fraud, resulting in the destruction of Dr. Bryan's medical practice."

Beginning with their answer denying liability on all counts, the Hospital and the other defendants consistently claimed immunity from monetary liability for their actions in terminating Bryan's clinical privileges because they were functioning in this matter, individually and collectively, as a professional review body in a peer review process. Later, the defendants filed motions for summary judgment, contending, *inter alia*, that they were immune from Bryan's suit for damages under HCQIA, 42 U.S.C. § 11111(a), and under Florida law, Fla.Stat.Ann. § 395.-0193(5).[20]

In disposing of the defendants' motions, the district court made the following rulings. First, material issues of fact remained concerning whether the applicable standards for peer review actions had been met; therefore,

---

so that he could refer to specific portions in presenting his appeal to the board; he did not do so. Nor does the record indicate that he claimed *at the time* that the bylaws required the board to obtain the transcript before taking action concerning his staff privileges. Moreover, the text of the relevant medical staff bylaw provision states only that "[t]he Hearing Panel shall maintain a record of the hearing by a reporter present to make a record of the hearing or a recording of the proceedings. The cost of such a reporter shall be borne by the hospital." A transcript of the first day of the Chanda panel hearings was prepared at Bryan's request and was available for the board's consideration.

19. The complaint also included the following various ancillary claims: (1) constitutional and civil rights claims under 42 U.S.C. § 1983 (1988); (2) federal contractual claims arising out of the Hospital's participation in the Medicare program; and (3) claims of "interference with prospective economic advantage" and intentional infliction of emotional distress. These causes

of action did not figure prominently in the litigation of this case, and the court disposed of these claims either on summary judgment or by granting a directed verdict in favor of the defendants. Because these claims are not before us on appeal, we do not discuss them further in this opinion.

20. For the text of the relevant HCQIA provisions, see *supra* part I. The Florida statute requiring that hospitals institute peer review procedures also provides legal protection to participants. The Florida law provides:

There shall be no monetary liability on the part of, and no cause of action for damages against, any licensed facility, its governing board or governing board members, peer review panel, medical staff, or disciplinary body, or its agents, investigators, witnesses, employees, or any other person for any action taken without intentional fraud in carrying out the provisions of this section.

Fla.Stat.Ann. § 395.0193(5).

a jury would have to decide the question of immunity. Second, Bryan lacked standing to pursue antitrust claims for damages under either Florida antitrust law or section 4 of the Clayton Act, 15 U.S.C. § 15(a) (1988),[21] but Bryan could assert a claim for injunctive relief under sections 1 and 2 of the Sherman Act, *Id.* §§ 1, 2 (Supp. IV 1993). The factual issues underpinning Bryan's eligibility for injunctive relief would be submitted to the jury, acting in an advisory role. Third, the record did not support Bryan's negligent supervision claim against the individual members of the board of directors. In sum, the following claims remained for trial: the state law damages claims for breach of contract and defamation, as well as the section 1 and 2 Sherman Act claims as to which the jury's verdict would be advisory.

This case was tried before a jury in June 1992.[22] At the close of Bryan's case, the district court directed a verdict in favor of all of the individual defendants on the various counts against them because the evidence was insufficient to support liability. The court concluded, however, that the evidence supported Bryan's claims for breach of contract against the Hospital, and denied the Hospital's motion for a directed verdict because material issues of fact remained concerning the federal and state peer review immunity statutes. The court also found that the evidence supported Bryan's antitrust claims against the Hospital and accordingly submitted those claims to the jury.

While the court's oral jury instructions recited some of the language from the immunity statutes, the court did not explain to the jury that the immunity provisions created a threshold question concerning whether Bryan was entitled to damages at all. Moreover, despite requests by counsel for Holmes, the special verdict form did not include any reference to the federal and state peer review immunity statutes.[23] Regarding the breach of contract claim, the special verdict form simply asked the jury to answer this question: "Did Holmes Regional Medical Center permanently terminate Dr. Bryan's medical staff privileges in violation of its bylaws?" If the jury answered "yes," the verdict form then directed it to quantify the damages sustained by Bryan as a proximate result of the Hospital's conduct. Similarly, regarding the antitrust claim, the verdict form only asked the jury "[h]as Holmes violated state and federal antitrust laws?"

The jury returned affirmative answers to the verdict form interrogatories regarding whether the Hospital had terminated Bryan in violation of the bylaws and whether this breach proximately caused damages to Bryan; and awarded Bryan $4,181,242 in damages for these violations. The jury also found that the Hospital had violated state and federal antitrust laws, thereby causing

---

**21.** This circuit applies a two-pronged test of antitrust standing: The court must first determine that the plaintiff has suffered " 'antitrust injury' " and then decide whether the plaintiff is "an efficient enforcer of the antitrust laws." *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1449 (11th Cir.1991). The district court held that Bryan had failed to demonstrate that he was an efficient antitrust enforcer.

**22.** At trial, as before the Chanda panel, Bryan presented testimony from various expert witnesses explaining that Bryan's actions were proper and did not adversely affect patient care; nothing in the record, they testified, would justify the revocation of Bryan's clinical privileges. This testimony was discounted by the Chanda panel. The experts themselves acknowledged at trial that a pattern of disruptive behavior could become so severe that disciplinary action would be required; on cross-examination, the experts also admitted that they had not examined all of the information considered by the Chanda panel. The Hospital also countered with expert testimo-

ny explaining why termination of Bryan's privileges was consistent with sound hospital administration.

Bryan also presented the testimony of witnesses who found fault with the Hospital's peer review procedures, particularly that a transcript of the Chanda panel hearings was not prepared for the board's use and that the Chanda hearing officer had become too inquisitorial in his questioning.

**23.** The following colloquy occurred during the brief charge conference after the court informed counsel of its intended instructions:

[COUNSEL FOR HOLMES]: [T]he special verdict as read does not include any of the immunity issues. Based on your decision on the directed verdict you've left the decision to the jury and we would respectfully request that the jury be instructed on the immunities.

THE COURT: I think that would be confusing to the jury, that's why I left them out. Of course, you can use that in your argument.

harm to Bryan; but the district court denied Bryan's post-trial request for injunctive relief under the antitrust laws, concluding that Bryan's remedy at law was adequate.

The Hospital appeals from the district court's judgment awarding Bryan damages for the termination of his medical staff privileges. Holmes first contends that the district court erred in failing to grant its motion for judgment on the state law damages claim based on immunity from liability under both state and federal laws governing the peer review process. In the alternative, the Hospital argues that a new trial is required because the trial court gave erroneous jury instructions and used an improper special verdict form. Bryan cross-appeals from the portion of the district court's summary judgment order denying the plaintiffs standing to seek damages under federal antitrust law.

## III.

### A.

 HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed.[24] Congress clearly intended HCQIA to permit defendants in suits arising out of peer review disciplinary decisions to file motions to re-

solve the issues concerning immunity from monetary liability as early as possible in the litigation process.[25] As the House Committee explained, "these provisions allow defendants to file motions to resolve the issue of immunity in as expeditious a manner as possible." H.R.Rep. No. 903, at 12, *reprinted in* 1986 U.S.C.C.A.N. at 6394. Several courts have resolved the issue of HCQIA immunity from damages liability on summary judgment. *See, e.g., Harris v. Bellin Memorial Hosp.,* 13 F.3d 1082, 1083 (7th Cir.1994); *Austin,* 979 F.2d at 734–35; *Islami v. Covenant Medical Center, Inc.,* 822 F.Supp. 1361, 1376–77 (N.D.Iowa 1992). Of course, although immunity may be determined at the summary judgment stage, resolution of that issue may be deferred until or after trial if the standards of Rule 56 cannot be satisfied. The substantive standards under HCQIA remain the same regardless of the point at which the immunity determination occurs.

 In civil rights cases brought under 42 U.S.C. § 1983 (1988), we have held that qualified immunity should not become a part of the jury instruction once the affirmative defense has been denied on a motion for summary judgment; the defense of qualified immunity should be decided by the court and should not be submitted for decision by the jury.[26] We conclude that the same proce-

24. As the House Committee explained:

The provisions would allow a court to make a determination that the defendant has or has not met the standards specified in section [11112(a)]. The Committee intends that the court could so rule even though other issues in the case remain to be resolved. For example, a court might determine at an early stage of litigation that the defendant has met the [section 11112(a)] standards, even though the plaintiff might be able to demonstrate that the professional review action was otherwise improper. At that point, it would be in order for the court to rule on immunity. In such a case, the court could still proceed to determine whether injunctive, declaratory, or other relief would be in order.

H.R.Rep. No. 903, at 12, *reprinted in* 1986 U.S.C.C.A.N. at 6394; *see also Austin,* 979 F.2d at 734 & n. 5.

25. The American Medical Association, appearing as amicus curiae in this case, urged this position on the court:

Under the HCQIA, the vast majority of lawsuits challenging peer review proceedings should be

dismissed at the summary judgment stage. Suits against peer reviewers should be allowed to go forward only when the plaintiff has rebutted the presumption that the peer review proceeding was reasonable and fair. Any lesser standard would deter physicians from serving as peer reviewers and would therefore undermine the purpose of the HCQIA.

26. The qualified immunity analysis in suits against government officials under 42 U.S.C. § 1983 provides a useful comparison. Although qualified immunity for government officials is a broader protection than that provided to peer review participants under HCQIA, the proper treatment of the two protections is substantially similar.

In qualified immunity cases, the favored approach is to have the immunity determination made by the court, prior to trial, whenever possible. *See Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (recognizing, of course, that qualified immunity is "an *immunity from suit* rather than a mere defense to liability [that] is effectively lost if a case is erroneously permitted to go to trial").

dure should be followed when considering a defendant's immunity from damages liability under HCQIA. A district court should consider the issue of HCQIA immunity from damages at the summary judgment stage. If it determines that the defendant is not entitled to such protection, then the merits of the case should be submitted to the jury without reference to the immunity issue. If there are disputed subsidiary issues of fact concerning HCQIA immunity, such as whether the disciplined physician was given adequate notice of the charges and the appropriate opportunity to be heard, the court may ask the jury to resolve the subsidiary factual questions by responding to special interrogatories. *Cf. Stone,* 968 F.2d at 1166 (similar framework for section 1983 qualified immunity cases); *see also Islami,* 822 F.Supp. at 1378 (following *Stone* framework in HCQIA case). Under no circumstances should the ultimate question of whether the defendant is immune from monetary liability under HCQIA be submitted to the jury.

In this case, we review the district court's denial of the Hospital's motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure.[27] Like the district court in ruling on the motion for judgment, we view all of the evidence in the light most favorable to the non-moving party. It is well established that "[j]udgment as a matter of law after the verdict may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A Moore's Federal Practice ¶ 50.-07[2] (1994). Accordingly, "we must independently determine whether the facts and inferences point so overwhelmingly in favor

of the movant ... that reasonable people could not arrive at a contrary verdict." *Roboserve, Ltd. v. Tom's Foods, Inc.,* 940 F.2d 1441, 1448 (11th Cir.1991). Moreover, "[t]he moving party is entitled to a [judgment as a matter of law] if the nonmoving party failed to make a showing on an essential element of his case with respect to which he had the burden of proof." *Smith v. United States,* 894 F.2d 1549, 1552 (11th Cir.1990) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

■ As the Ninth Circuit has explained, the rebuttable presumption of HCQIA section 11112(a) creates an unusual summary judgment standard that can best be expressed as follows: "Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?"[28] *Austin,* 979 F.2d at 734. If not, the court should grant the defendant's motion. In a sense, the presumption language in HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable. Of course, motions for summary judgment under Rule 56 bear a close relationship to motions for judgment as a matter of law under Rule 50. Courts frequently apply the same standards when ruling on the two motions, although a motion for judgment as a matter of law may be granted although a prior motion for summary judgment raising the same issues had been denied. Therefore, we adopt the Ninth Circuit's statement of the applicable standard in this case as well: "[O]ur

When the issue cannot be resolved on summary judgment, we have held that "a jury should seldom, if ever, be instructed on qualified immunity; the availability of a qualified immunity defense is a question of law for the court to determine." *Ansley v. Heinrich,* 925 F.2d 1339, 1341 (11th Cir.1991). Accordingly, "[a]lthough the district court preferably makes this determination before trial, qualified immunity is a legal determination that must be made by the court and may be made either before trial, during trial, or after trial." *Stone v. Peacock,* 968 F.2d 1163, 1165 (11th Cir.1992).

27. The Hospital had moved for judgment as a matter of law (for a directed verdict) under Rule

50(a) at the close of Bryan's case and again at the close of all the evidence. The court denied both motions, rejecting the Hospital's assertion of immunity from monetary liability under the federal and state statutes. The issue, therefore, was properly preserved for a post-trial motion for judgment.

28. As the Supreme Court has explained, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

inquiry focuses on whether [Bryan] provided sufficient evidence to permit a jury to find that he ha[d] overcome, by a preponderance of the evidence, the presumption that [the Hospital] would reasonably have believed" that it had met the standards of section 11112(a). *Austin,* 979 F.2d at 734.

■ If a jury returns a verdict awarding damages to a disciplined physician but the evidence at trial conclusively demonstrates that the defendant has satisfied HCQIA standards for peer review procedures (thereby being entitled to immunity from monetary liability), then the court should grant a post-trial judgment as a matter of law under Rule 50(b). We must examine the record in this case to determine whether Bryan satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of HCQIA.

### B.

■ Before determining whether the procedural standards for proper peer review proceedings were satisfied in this case, we first note that the events and entities at issue here fall squarely within the definitions of HCQIA's operative terms. The disciplinary action at issue here is the November 1990 decision by the Holmes board of directors to revoke Bryan's staff privileges. The term "professional review action" is defined in HCQIA as follows:

> [A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges ... of the physician.

42 U.S.C. § 11151(9).[29] The revocation of Bryan's staff privileges therefore qualifies as such a professional review action; the statute seems to contemplate inclusion of the recommendations upon which the board's ultimate decision was based—here, the recommendations of the Chanda panel and the executive committee—within the scope of the relevant conduct.

■ A "professional review body" is defined as "a health care entity and the governing body or any committee of a health care entity which conducts professional review activity, and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." *Id.* § 11151(11). Furthermore, the term "health care entity" includes "a hospital that is licensed to provide health care services by the State in which it is located." *Id.* § 11151(4)(A)(i). The Holmes decisionmakers in Bryan's case fall within those categories. As a result, the Hospital is entitled to immunity from monetary liability under section 11111(a) of HCQIA if the peer review process met the standards set forth in section 11112(a).

### C.

■ As stated above, a professional review action must satisfy the four standards of section 11112(a) in order to qualify for the immunity protections of section 11111(a). We discuss each in turn and conclude that the Hospital's termination of Bryan's clinical privileges met HCQIA requirements.

### 1.

■ First, a review of the record makes clear that the decision to terminate Bryan's clinical privileges at Holmes was taken "in the reasonable belief that the action was in the furtherance of quality health care." *Id.* § 11112(a)(1). This prong of the HCQIA immunity test is met if "the reviewers, with

29. While its meaning is generally apparent, the statute does provide the following definition of "professional review activity":
> [A]n activity of a health care entity with respect to an individual physician—
> (A) to determine whether the physician may have clinical privileges with respect to, or membership in, the entity,

> (B) to determine the scope or conditions of such privileges or membership, or
> (C) to change or modify such privileges or membership.

42 U.S.C. § 11151(10). Again, the termination of Bryan's medical staff privileges clearly falls within the HCQIA definition.

the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." H.R.Rep. No. 903, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6393. The record in this case reveals that the revocation of Bryan's privileges was prompted by the reasonable belief that doing so would promote quality health care. Bryan had exhibited a pattern of unprofessional conduct over a period of many years, and he was given a series of opportunities to remedy his difficulties in interacting with other staff members. Eventually, the Hospital concluded that, because of his behavior, Bryan's presence in the operating room and in patient rooms was disruptive and interfered with the important work of other employees. Moreover, the board was properly concerned about the circumstances surrounding the misdirection of the two patients to surgery. Accordingly, the Hospital dealt appropriately with the perceived situation in terminating Bryan's privileges.

At trial, Bryan asserted that the members of the board of directors and the executive committee were primarily motivated by personal animosity and not by concern for patient care. He introduced no evidence, however, that such hostility determined the outcome of the peer review process. Moreover, Bryan's "assertions of hostility do not support his position [that the Hospital is not entitled to the HCQIA's protections] because they are irrelevant to the reasonableness standards of § 11112(a). The test is an objective one, so bad faith is immaterial. The real issue is the sufficiency of the basis for the [Hospital's] actions." *Austin,* 979 F.2d at 734. We therefore conclude that Bryan failed to provide sufficient evidence to permit a jury to find that he had overcome, by a preponderance of the evidence, the presumption that the Hospital's disciplinary action was taken in the reasonable belief that it would further quality patient care.

### 2.

■ Second, a review of the record reveals that the Holmes board of directors took its action "after a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2). The board terminated Bryan's medical staff privileges only after Bryan's conduct had been evaluated by the executive committee, the Chanda peer review panel, and an appellate review panel of board members. Each of those groups submitted reports to the board, which made its decision based upon the documentary record developed during the various peer review proceedings and after Bryan had the opportunity to make a presentation. Bryan introduced no competent evidence at trial to suggest that the Hospital's efforts to obtain the facts before terminating his staff privileges were not reasonable.

### 3.

■ Third, Bryan's staff privileges were revoked only "after adequate notice and hearing procedures [were] afforded to the physician involved or after such other procedures as [were] fair to the physician under the circumstances." *Id.* § 11112(a)(3). As noted above, section 11112(b) sets forth the "safe harbor" conditions that a health care entity must meet regarding adequate notice and hearing. Section 11112(b) provides as follows:

A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

(1) Notice of proposed action

The physician has been given notice stating—

(A)(i) that a professional review action has been proposed to be taken against the physician,

(ii) reasons for the proposed action,

(B)(i) that the physician has the right to request a hearing on the proposed action,

(ii) any time limit (of not less than 30 days) within which to request such a hearing, and

(C) a summary of the rights in the hearing under paragraph (3).

(2) Notice of hearing

If a hearing is requested on a timely basis under paragraph (1)(B), the physician involved must be given notice stating—

(A) the place, time, and date, of the hearing, which date shall not be less than 30 days after the date of the notice, and

(B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice

If a hearing is requested on a timely basis under paragraph (1)(B)—

(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—

(i) before an arbitrator mutually acceptable to the physician and the health care entity,

(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

(iii) before a panel of individuals who are appointed by the entity and are not in direct competition with the physician involved;

(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

(C) in the hearing the physician has the right—

(i) to representation by an attorney or other person of the physician's choice,

(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

(iii) to call, examine, and cross-examine witnesses,

(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

(v) to submit a written statement at the close of the hearing; and

(D) upon completion of the hearing, the physician involved has the right—

(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations, and

(ii) to receive a written decision of the health care entity, including a statement of the basis for the decision.

*Id.* § 11112(b).

As the summary of the facts of the case in part II of this opinion reflects, each of these procedural requirements of section 11112(b) was satisfied. Documents introduced at trial indicate that the Hospital complied with the notice requirements and that the hearings were held in a timely fashion and in accordance with the Hospital's bylaws. Bryan was afforded full rights of representation, cross-examination, and confrontation.

Bryan's principal argument is that the board of directors did not have a transcript of the Chanda panel hearings when it rendered its decision. Yet HCQIA, like the Holmes bylaws, requires only that the Hospital ensure that a record of the proceedings be made; Bryan had the responsibility to request a complete transcript if he thought the board should have one, and he did not.

It should be noted that section 11112(b) specifically provides that the failure of a review body to meet the enumerated conditions does not, per se, constitute a failure to meet the standards of section 11112(a)(3). Indeed, "[i]f other procedures are followed, but are not precisely of the character spelled out in [section 11112(b)], the test of 'adequacy' may still be met under other prevailing law." H.R.Rep. No. 903, at 10, *reprinted in* 1986 U.S.C.C.A.N. at 6393. Moreover, Bryan made no contemporaneous objections to the manner in which the hearing procedures were conducted; section 11112(b) explicitly provides that compliance with its terms is not required if the physician voluntarily waives them. On the record of this case, we conclude that no reasonable jury could conclude that the Hospital had not afforded Bryan the adequate procedures.

4.

■ Finally, there is no question that the board decided to terminate Bryan "in the

reasonable belief that the action was warranted by the facts known." 42 U.S.C. § 11112(a)(4). Again, the record reveals that the board certainly had a factual basis for its action. Bryan concedes that the incidents that led to his termination actually occurred; his only argument is that they did not justify the severe sanction he received. HCQIA clearly grants broad discretion to hospital boards with regard to staff privileges decisions. Accordingly, as in all procedural due process cases, the role of federal courts "on review of such actions is not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges." *Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir.1989). No reasonable jury could conclude that Bryan had demonstrated, by a preponderance of the evidence, that the Hospital board did not act in the "reasonable belief that the [termination] was warranted by the facts known after reasonable effort to obtain facts" as required by section 11112(a)(4). 42 U.S.C. § 11112(a)(4).

### IV.

In this case, a disciplined physician attempted to have a jury revisit the adverse decision of his medical colleagues. This is precisely the type of case that Congress targeted when passing HCQIA: "[T]he intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." *Mahmoodian v. United Hosp. Ctr., Inc.*, 185 W.Va. 59, 404 S.E.2d 750, 756, *cert. denied*, — U.S. ——, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991).

Given that all of the section 11112(a) standards were satisfied, we conclude that the Hospital was entitled to the immunity from damages liability granted by HCQIA in § 11111(a).[30] On the record developed at trial, Bryan could not recover the damages

---

30. Because our holding on this point disposes of all of the claims in the case, we need not reach the question of whether the Hospital was protected from monetary liability under the Florida peer review statute, Fla.Stat.Ann. § 395.0115(5).

awarded by the jury. The district court therefore should have granted the Hospital's post-trial motion for judgment as a matter of law under Rule 50(b). Accordingly, we REVERSE the judgment of the district court denying the Hospital's motion for judgment as a matter of law.

IT IS SO ORDERED.

Bryan has not appealed the district court's refusal to grant injunctive relief under the antitrust laws, thus we need not address the merits of the antitrust causes of action.