**Manzetti v. Mercy Hospital**

520

*Peter Matthews Wright,* for plaintiffs.
*Eric W. Springer,* for defendants.

WETTICK, *J.*, November 12, 1996—Defendants' motion for summary judgment is the subject of this opinion and order of court. Defendants' motion is based on the contention that they are immune from liability for money damages under the Federal Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §§11101-11152.

Dr. Gene W. Manzetti held privileges to perform open-heart surgery at Mercy Hospital from July 1979 until February 11, 1994.[1] Between 1990 and February 1994, the only physicians performing open-heart surgery at Mercy Hospital, other than Dr. Manzetti, were seven physicians employed by Three Rivers Cardiac Institute. Three Rivers Cardiac is headed by Dr. Ronald V. Pellegrini, the chief of the Division of Cardiovascular Surgery at Mercy Hospital. Over a four-year period, from 1990 through 1993, these seven physicians employed by Three Rivers Cardiac performed a total of 2,650 open-heart surgeries and Dr. Manzetti performed a total of 40 open-heart surgeries.

---

1. Mercy Hospital is governed by a Board of Trustees. The board employs a president and chief executive officer (Mr. Edward T. Wenzke) to manage the hospital. The hospital's Board of Trustees promulgates bylaws, for the medical staff by which all physicians receiving staff privileges agree to be bound.

Under the hospital's bylaws, a medical executive committee has significant responsibilities over many health care issues including the granting and suspension of staff privileges. This committee includes the chairpersons of each of the clinical departments and is headed by an elected president of the medical staff. Under these bylaws, the medical staff, through its medical executive committee, may temporarily suspend the staff privileges of a physician and may recommend to the Board of Trustees the revocation of privileges of a physician.

When Dr. Manzetti began performing open-heart surgery at Mercy Hospital, he was an employee of Three Rivers Cardiac. By mutual agreement, he left Three Rivers Cardiac in late 1982 or early 1983. Except for a short time when he was associated with another physician, Dr. Manzetti has practiced as a sole practitioner since leaving Three Rivers Cardiac.

In August 1993, Dr. Mitchell Massie, a surgical resident at Mercy, approached Dr. Pellegrini to describe four cases that he had worked on with Dr. Manzetti in which he expressed serious concerns about the quality of Dr. Manzetti's work. He also told Dr. Pellegrini that while he believed that it was better to have the more experienced residents work with Dr. Manzetti, he had "a lot of ethical and moral problems after finishing a case with Dr. Manzetti" (T. 24-25, 117), and that he "was really having a hard time to go back and operate with him." (T. 24-25, 117.) [2]

Thereafter, Dr. Ross F. DiMarco contacted Dr. Pellegrini to advise him that Dr. Manzetti had called him about a patient that had died during the night. Dr. DiMarco described Dr. Manzetti as emotionally distraught and wanting some reassurance that he was a good surgeon. (T. 25.) Dr. Pellegrini then spoke to Dr. Manzetti and asked him not to perform any more open-heart surgeries so that any formal restrictions of his activities could be avoided. (T. 25-26.) Thereafter, Dr. Manzetti did two additional open-heart surgeries. The first was uneventful and the second was, according to Dr. Pellegrini, a case with a lot of problems. Dr. Pellegrini made the decision that Dr. Manzetti should be suspended

---

2. The transcript references are to a transcript of a hearing before a fair hearing panel—see exhibit 2 of defendants' exhibits in support of defendants' motion for summary judgment.

until there could be a meeting with the chief of surgery who was out of town. (T. 27-30.)

During the early afternoon of February 11, 1994, defendant Edward T. Wenzke, president of Mercy Hospital, submitted a letter to Dr. Manzetti informing him that his privileges to perform open-heart surgery were temporarily suspended.[3] This action was taken after a meeting attended by Dr. Dennis Manning, the elected president of the medical staff, Dr. Howard Zaren, the chairperson of the Department of Surgery, Dr. Pellegrini, and Mr. Wenzke. At this meeting, Dr. Pellegrini described the information that he had received from physicians who had worked with Dr. Manzetti that in his opinion raised serious questions about Dr. Manzetti's competence.

An emergency meeting of Mercy Hospital's medical executive committee was held in the late afternoon of February 11, 1994. The committee voted to continue the summary suspension of Dr. Manzetti's open-heart surgery privilege pending further investigation. The committee based its decision on information which Dr. Pellegrini provided. According to Dr. Manning's testimony, the committee members went over Dr. Pellegrini's concerns in detail, they cross-examined Dr. Pelle-

---

3. Open-heart surgery comprises a small percentage of Dr. Manzetti's practice. Dr. Manzetti performs other types of surgery at Mercy Hospital. He also performs surgery at three other local hospitals. Dr. Manzetti's privileges to perform other types of surgery at Mercy Hospital and Dr. Manzetti's staff privileges at other hospitals are not affected by the suspension of his privileges to perform open-heart surgery. Dr. Manzetti performed open-heart surgery only at Mercy Hospital, so the suspension of his open-heart surgery privilege at Mercy Hospital means that he will not be able to perform any open-heart surgery.

grini as to his reasoning, and they concluded that summary suspension was appropriate. (T. 287-88.)

At this February 11, 1994 meeting, the committee arranged for various members to make an independent investigation, to evaluate charts, and to conduct interviews. (T. 288.) At a February 24, 1994 meeting, the medical executive committee, after considering reports, statistics, and interview summaries prepared pursuant to this investigation, continued the summary suspension that was imposed on February 11, 1994.

Pursuant to the medical staff bylaws, Dr. Manzetti requested a hearing before a fair hearing panel. On May 14, 1994, the hearing was commenced before three physicians selected by Mercy Hospital: Dr. Sebastian Arena, chief of otorhinolaryngology, Department of Surgery; Dr. Charles E. Copeland, chief of Division of General Surgery, Department of Surgery; and Dr. Edward J. McClain Jr., chief of Division of Orthopedic Surgery, Department of Surgery. Attorney Frederick N. Egler was selected by Mercy Hospital to serve as the hearing officer. Both the medical executive committee and Dr. Manzetti were represented by counsel.

At the first day of the hearing, the medical executive committee presented its entire case which consisted of 16 witnesses. The hearing resumed on October 25, 1994; Dr. Manzetti was the only witness to testify on that day. The hearing was completed on the following day; Dr. Manzetti presented four additional witnesses and Mercy Hospital presented two rebuttal witnesses. The following is a summary of the testimony based on my reading of the transcript:

The medical executive committee's first witness was Dr. Pellegrini. He testified that Dr. Manzetti has always had a low volume of cases. The American Heart Association and the American College of Cardiology rec-

ommend that a surgeon perform between 100 and 150 open-heart cases each year to be proficient in maintaining an appropriate skill level. From 1990 into 1994, Dr. Manzetti was performing less than 15 open-heart cases a year. (T. 30-32.)

He also testified about matters reflecting on Dr. Manzetti's skill level. It is preferable to use an internal mammary artery graft as opposed to a vein graft. However, Dr. Manzetti used the internal mammary graft on only 38 percent of his patients. (T. 32-33.) He testified that Dr. Manzetti's pump time is about one-third longer than the pump time of the Three Rivers Cardiac physicians and that longer pump time increases the risk to the patient. (T. 33-34.) He testified that Dr. Manzetti's cross-clamp time is fairly high and that increased cross-clamp time can damage the heart. (T. 35.) He testified that there were reports about Dr. Manzetti's excessively manipulating the heart. (T. 38-39.) He testified that Dr. Manzetti constantly had problems with vein grafts—his grafts would either be too long or too short. (T. 49-52.)

The next witness was Dr. Massie, the surgical resident who had approached Dr. Pellegrini in August 1993. He described the four cases in which he had concerns about Dr. Manzetti's performance.

The next witness was Dr. Robert H. Boretsky, the interim chief of the Division of Cardiovascular Anesthesia at Mercy Hospital. He testified that he had worked with Dr. Manzetti on a number of occasions since joining the Mercy Hospital staff in 1989. He has concerns related to the quality of care that Dr. Manzetti provides to his open-heart surgery patients. He testified that Dr. Manzetti appeared to be unsure of what to do in critical situations; there were higher incidents of coincidental damage to the heart; there were higher

incidents in which the vein grafts were too short; there was greater manipulation of the heart as compared to other surgeons; his surgeries lasted for an undue amount of time as compared to other surgeons; and there was an increased need for pressor support in Dr. Manzetti's cases. (T. 137-43.) When asked what he would tell an acquaintance who called him to say that he or she was scheduled for open-heart surgery with Dr. Manzetti, he testified that he would attempt to persuade this person to make a different choice. (T. 144.)

The next six witnesses were other staff anesthesiologists at Mercy: Dr. Chester A. Phillips III, Dr. Richard J. Kuwik, Dr. Patrick J. Vlahos, Dr. Daniel R. Sullivan, Dr. David L. Greenblatt, and Dr. Christopher A. Troianos. Each testified that he would advise an acquaintance to see another surgeon if advised that the acquaintance had arranged for open-heart surgery with Dr. Manzetti. Dr. Phillips testified that Dr. Manzetti's patients never seem to do as well, the operations never seem to go smoothly, cases take longer, there are problems with vein grafts and an awful lot of handling of the heart. Dr. Kuwik's testimony was devoted primarily to one particular case in which he was critical of Dr. Manzetti's performance. Dr. Vlahos testified that Dr. Manzetti's patients are on a bypass longer than other patients; require more inotropes and pressors to come off bypass; cross-clamp times are longer; and there are problems with not measuring the length of vein grafts. (T. 189-91.) Dr. Sullivan testified that Dr. Manzetti's performance gives him reason to be concerned about the patients. The pump time is significantly longer; cross-clamp times are longer; the percentage of patients that require inotropic support are significantly greater; and there are more problems. He referred to a code, as did some of the other anesthesiologists, spe-

cifically for Dr. Manzetti's cases which refers to shortening or lengthening of grafts. (T. 200.) Dr. Greenblatt testified that "we are always a little bit more concerned about dealing with Dr. Manzetti's cases than the other ones." (T. 204.) The biggest concerns were longer bypass times and cross-clamp times, which create a more difficult time for the anesthesiologist in weaning these patients from the bypass. (T. 204-05.) Dr. Troianos testified that Dr. Manzetti's patients generally do not do well; anesthesiologists have to give more support in terms of drugs to bring the patients off the bypass. For Dr. Manzetti's cases, there are longer operations, longer times on the bypass machine, and longer cross-clamp times. He also referred to a specific code dealing with Dr. Manzetti's grafts being too short or too long.

The next witness was Dr. Donna M. Lucas, another staff anesthesiologist. As a staff anesthesiologist, she had worked on only one case with Dr. Manzetti; this was the final open-heart surgery that Dr. Manzetti performed. She testified that Dr. Manzetti had arranged for the patient to receive Protamine prematurely and that there were problems concerning the packing of the heart, problems with the vein graft being too short, and prolonged pump time and cross-clamp time. She also disagreed with the discharge summary and operative report prepared by Dr. Manzetti which stated that the patient's operative course was "uncomplicated" and that there were "no intraoperative complications." (T. 227.) Dr. Lucas is married to Dr. Pellegrini.

The next witness was Dr. Gary J. Ferrese. He is the supervisor of the perfusion team. He testified that at times Dr. Manzetti's performance gives him reason to be concerned about Dr. Manzetti's patients. The length of the procedure is the main problem. He also talked

about problems concerning graft lengths and referred to a special code for Dr. Manzetti.

On cross-examination, he was asked whether the surgeons from Three Rivers Cardiac are assisted by other surgeons who harvest veins and do backup for the primary surgeon. Dr. Ferrese testified that the Three Rivers Cardiac surgeons have their own physicians' assistants who harvest veins which shortens the length of time in the operating room. (T. 239.) Dr. Manzetti, on the other hand, must rely on any residents and interns that Mercy provides; he does not bring a physician's assistant.

The next witness was Mr. David Atkins, supervisor of the Cardiovascular Surgical Intensive Care Unit. Previously, he managed the operating room of cardiovascular and orthopedic surgery. He was never present during any operations, so information that he received concerning Dr. Manzetti's surgeries was secondhand. He testified that there was a special code with regard to Dr. Manzetti's cases regarding grafts initially cut too short. On cross-examination, he testified that Dr. Manzetti's patients seem to be sicker preoperatively.

The next witness was Dr. William D. Hetrick, chair of the Department of Anesthesiology and a member of the medical executive committee. He was one of the physicians assigned to conduct an investigation of Dr. Manzetti's cases following the February 11, 1994 meeting of the medical executive committee. He testified that after the initial suspension, he interviewed all members of the Division of Cardiovascular Anesthesia (except for Dr. Greenblatt who was out of town) and prepared written reports which he asked each physician to sign. These were provided to the medical executive committee for its February 24, 1994 meeting.

He testified that he reviewed as many records for Dr. Manzetti's cases for the years 1993 and 1994 as he could obtain and randomly selected an equal number of cases of other surgeons in the division for the purpose of recording total anesthesia time, total bypass or pump time, total cross-clamp time, and information regarding the use of intra-aortic balloon counter pulsation and the use of pressors. The results of this review (exhibit 3 of the Gene Manzetti M.D. fair hearing) were provided to the medical executive committee for its February 24, 1994 meeting.[4]

The next witness was Dr. Ross F. DiMarco Jr., vice-chief of the Division of Cardiovascular Surgery and chair of the board of Mercy Heart Institute. (T. 257.) He believes that Dr. Manzetti has sufficient skills but that his judgments are less than satisfactory. He has concerns about the small number of open-heart cases that Dr. Manzetti performs and believes that it relates to his judgment skills. He testified that it may be okay for a physician to occasionally perform open-heart surgery for a simple case without complications; however, every time you put a patient on the operating room table you have to assume that it is going to be a difficult, complicated procedure and, consequently, you need experience to develop judgmental skills to deal with various situations as they arise. (T. 260-61.) He is aware of the code that is used among the surgical team with regard to events in Dr. Manzetti's surgeries. (T. 262-63.)

---

4. Exhibit 3 shows 17 cases for Dr. Manzetti and 21 for Three Rivers Cardiac. The total anesthesia time was 452 minutes for Dr. Manzetti and 319 minutes for Three Rivers Cardiac; pump time—171 minutes compared to 105; cross-clamp time—80 minutes compared to 54 minutes; no pressure support—8/17 cases in comparison to 19/21 cases; use of post-operative pharmacological support—13/17 cases compared to 2/21 cases.

He testified that he does not believe that Dr. Manzetti provides an acceptable level of quality open-heart surgery care to his patients. (T. 263.)

The next witness was Dr. Howard A. Zaren, chair of the Department of Surgery and director of the Cancer Center at Mercy Hospital. He is a member of the medical executive committee. He discussed the events of February 11, 1994 and the directions given to him by the medical executive committee to gather information for purposes of the subsequent meeting. He arranged for the gathering of statistical data and interviews with staff anesthesiologists, residents, and Dr. Manzetti. He provided the medical executive committee for its February 24, 1994 meeting with exhibit 5 of the Gene Manzetti M.D. fair hearing which compares Dr. Manzetti's evaluations by residents with the evaluations of the other members of the Division of Cardiothoracic Surgery.

Dr. Zaren also testified that there was no rule that would have prevented Dr. Manzetti from hiring his own physician's assistant to assist him in the surgery if he believed that it is what he needed for quality care. He also testified that it would be inappropriate for Dr. Manzetti to rely on residents because the only role for the residents at Mercy Hospital is education: "Residents are not there for service, they are not to do service support." (T. 278-79.)

The next witness was Dr. Dennis M. Manning, the elected president of the medical staff. He described the February 11, 1994 meeting between Mr. Wenzke, Dr. Zaren, Dr. Pellegrini, and himself that resulted in a temporary suspension of Dr. Manzetti's open-heart surgery privilege; the emergency meeting of the medical executive committee later that afternoon that Dr. Pellegrini was invited to attend; the investigation that was

commissioned; and the February 24, 1994 meeting of the medical executive committee. He also described two additional exhibits received by the medical executive committee at the February 24, 1994 meeting. Exhibit 6 of the Gene Manzetti M.D. fair hearing is an evaluation of 26 of Dr. Manzetti's recent cases by two surgeons; they describe cases in which they saw certain complications. Exhibit 2 sets forth the percentage of deaths and the percentage of internal mammary artery usage for all of the bypass surgeries conducted for a four-year period from 1990 through 1993 by Three Rivers, Dr. Manzetti, and the two Three Rivers physicians with the highest mortality rates:

|  | Total Cases | % Mortality | % IMAs |
|---|---|---|---|
| Three Rivers | 2,650 | 2% | 85% |
| Dr. Manzetti | 40 | 8% | 38% |
| Dr. Sortino | 281 | 4% | 78% |
| Dr. Grant | 254 | 3% | 86% |

On cross-examination, Dr. Manning was asked whether the medical executive committee took into account that Dr. Pellegrini was in direct economic competition with Dr. Manzetti. He testified that the point was raised and that he had a broad range of doctors involved in the investigation to ensure that it was an independent investigation separate from Dr. Pellegrini who initially brought the charge. (T. 299-302.) He also testified that Dr. Pellegrini's competition is "extramural; it's not here in the hospital." (T. 300.)

The hearing resumed on October 25, 1994 in order for Dr. Manzetti to present his evidence. Only Dr. Manzetti testified on October 25, 1994. He defended the treatment that he provided in each of the specific cases

that was described at the May 1994 hearing. He also discussed the testimony of the medical witnesses about his pump time, cross-clamp time, the total time in which the patients are under anesthesia, the manner in which he manipulates the heart, and the manner in which he harvests the veins. He testified that his surgical techniques are being compared to the techniques of the Three Rivers Cardiac Institute physicians who are influenced by Dr. Pellegrini in the manner in which they practice. He testified that there are different schools of thought as to the use of post-operative pharmacological support, manipulation of the heart, the manner in which physicians measure vein grafts, the use of vein grafts versus the use of internal mammary arteries, and whether the additional time that his operations take increases risk to the patient.

He also testified that his longer surgery time is not attributable to a lack of surgical skills but rather to his having no physician's assistant to assist him in surgery. He testified that for as long as he can remember he has had difficulty getting help in the operating room. (T. 456.) At times he must rely on surgical residents who are very young and have difficulty taking out vein grafts. In fact, he thinks that about 50 percent of the time he does not have a surgical resident but, instead, must rely on a scrub technician. (T. 456-57.) When he has an inexperienced surgical resident who will have difficulty taking out vein grafts, he must utilize vein grafts from the legs rather than internal mammary grafts. (T. 449, 480.) While he does not agree that there is any basis for requiring a higher number of surgeries, he testified that he has a low case volume and has been unable to improve the number over the years. (T. 454, 466-69.) He never considered hiring a physician's assistant or developing his own team because

he did not have enough open-heart surgeries to make it feasible. He also testified that an explanation for his higher mortality rate in comparison to Three Rivers Cardiac and his greater use of leg veins is that his patients are sicker and older.

Dr. Manzetti's remaining witnesses testified on October 26, 1994. His first witness was Mr. Mark Kasunic who has a background in statistics. He testified that the statistics that the medical executive committee offered (exhibit 3 of the fair hearing) which compared Dr. Manzetti's 17 cases with three cases of seven other physicians did not allow a comparison of Dr. Manzetti with any individual physician and that the statistical findings may be explained by individual factors such as the complexity of the cases. As for exhibit 2, Mr. Kasunic testified that conclusions as to mortality based on comparing 2,650 cases with 40 cases is invalid because one or two deaths within 40 cases vastly increase the percentages.

Dr. Manzetti's next witness was Dr. Robert L. Hardesty, a highly respected cardiothoracic surgeon at the University of Pittsburgh. He testified that it is possible to determine whether a physician's mortality rates are excessive by the use of a program comparing actual results with predicted results that take into account the risk factors. He testified that for Dr. Manzetti's cases, the predicted mortality is 9.3 percent, his actual results are 10.8 percent, and this is an acceptable deviation. (T. 563.) He also testified that cross-clamp time in and of itself is a risk factor but that Dr. Manzetti's average time of 80 minutes is an acceptable figure. (T. 566-68.) With respect to the criticism of Dr. Manzetti's use of the internal mammary artery only 38 percent of the time, he testified that there are a number of modifying factors that may be valid reasons for not using an internal

mammary artery. (T. 569-70.) He also testified that there are no standards as to how to measure vein graft lengths. He reviewed specific cases of Dr. Manzetti and concluded that Dr. Manzetti's patient management fell within the accepted standard of care.

On cross-examination, Dr. Hardesty testified that there were six or seven physicians in his cardiovascular group and that each of them performs between 100 and 150 open-heart surgeries a year with the exception of one of the newer members. (T. 595.)

Dr. Manzetti's next witness was Dr. Thomas Gasior, a staff anesthesiologist at Presbyterian University Hospital and an associate professor of anesthesiology and critical care medicine in the Health Center. He testified that he reviewed the records of Dr. Manzetti's cases from an anesthetist's viewpoint and found nothing in Dr. Manzetti's case management which led him to believe that the treatment fell below the accepted standard of care.

Dr. Manzetti's final witness was Dr. Thomas Generalovich. He has referred 40 to 50 patients to Dr. Manzetti since 1984. He is satisfied with Dr. Manzetti's case management and will refer cases to Dr. Manzetti again if Dr. Manzetti's privileges are restored. Dr. Generalovich is not a cardiothoracic surgeon but he is a staff cardiologist at Mercy Hospital.

The medical executive committee offered two rebuttal witnesses. The first witness (Ms. Mary Menegazzi) presented an exhibit comparing the "severity" of Three Rivers Cardiac patients with Dr. Manzetti's patients which showed that the patients are very similar in terms of severity. The final witness (Dr. Joyce A. D'Antonio, an epidemiologist with a Ph.D.) testified that the comparison of Dr. Manzetti's cases with Three Rivers Cardiac cases was appropriate. On recross-examination she

said that this is not the type of data that would be used for a life or death decision. (T. 677.)

On December 5, 1994, the hearing panel submitted a 15-page report and recommendation.[5] The report reviewed the testimony of each of the witnesses. The panel concluded that the evidence showed a number of facts that justified the decision to bar Dr. Manzetti from performing open-heart surgery. The report said that the most significant feature was the admittedly low volume of cases:

"Twenty to 25 cases a year of open-heart surgery is just not enough to keep up the required skills. The fact that his volume has remained at this level for over 10 years further implies that the situation is not going to change because as a sole practitioner, Dr. Manzetti is not likely to develop new referral patterns at this point." Report at 13.

The panel found "the failure to document complications" to be troubling. *Id.*

The panel also concluded that the relationship between Dr. Manzetti and the technicians, anesthesiologists, and perfusionists has a deleterious effect on the quality of care for the patient. The report said that Dr. Manzetti, as the "captain of the ship," must bear the responsibility for this relationship, and that it is particularly troubling when the anesthesiologists as a group testified that if some acquaintance of theirs was a candidate for open-heart surgery and slated for Dr. Manzetti, they would recommend that the patient go elsewhere. *Id.*

The report also said that while sole practice may be appropriate in some situations, sole practice mitigates

5. This report and recommendation is defendants' exhibit 4 (vol. II).

against the high quality of care that is needed for open-heart surgery. *Id.* at 14.

On December 12, 1994, counsel for Dr. Manzetti requested appellate review of the decision of the fair hearing panel. Mercy Hospital appointed a review panel consisting of two physicians, Dr. Narayan T. Nayak and Dr. James J. McCague, and one attorney, John C. Unkovic, Esquire, a member of the Board of Trustees of Mercy Hospital. An argument was held on January 5, 1995.[6] On February 15, 1995, the review panel submitted a 13-page report to the Board of Trustees.[7] Parts II-VI of the report discuss Dr. Manzetti's arguments and Part VII sets forth the review panel's recommendations.

In Part II, the review panel rejects Dr. Manzetti's argument that he should not have been subject to a suspension of his open-heart surgery privilege because he had never been disciplined or sanctioned throughout the entire 11-year period that he performed open-heart surgery at Mercy Hospital. The review panel concluded that given the inherent nature of open-heart surgery and the consensus of concern voiced by many medical staff members, Mercy was not precluded from suspending his open-heart surgery privilege and that the medical executive committee presented substantial evidence that supported the decision. In Part III, the review panel rejects Dr. Manzetti's argument that he was denied due process and a fair hearing. The review panel found that he was represented by legal counsel, had a full

---

6. The argument was transcribed—see defendants' exhibit 7 (vol. II).

7. The report of the review panel is defendants' exhibit 8 (vol. II).

opportunity to present evidence and cross-examine witnesses and was fully aware at all relevant times of the allegations against him. In Part IV, the panel rejects Dr. Manzetti's argument that the hearing report is arbitrary and capricious. On the basis of the evidence presented to the hearing panel, including undisputed evidence concerning Dr. Manzetti's low volume of cases, the review panel concluded that the medical testimony offered by the medical executive committee and accepted by the hearing panel fully supports the findings and recommendations in the hearing report. In Part V, the review panel rejects Dr. Manzetti's argument that the decision was not supported by substantial evidence, stating that there was clear evidence that Dr. Manzetti's performance and frequency of open-heart surgery did not meet the standards desired by Mercy Hospital and its medical staff and that substantial evidence in the record supported the hearing report. Part VI rejects Dr. Manzetti's claim that Mercy Hospital's decision was inspired by his purported competition with Dr. Pellegrini and by so-called political considerations. The review panel states that there is no support in the record for these allegations, that if Dr. Pellegrini wanted to stifle competition he would have tried to do so well before 1994, and that as to the other witnesses presented by the medical executive committee, the record not only does not support improper motivation but "completely negates it." (Recommendations of the review panel at 10.)

In Part VII, the review panel made two recommendations: (1) that the Board of Trustees affirms the recommendation of the hearing panel that Dr. Manzetti's privilege to practice open-heart surgery be suspended, and (2) assuming the medical staff gives its approval,

that Dr. Manzetti be given a provisional open-heart surgery privilege for one year subject to various conditions, including that he be directly assisted at all times by a board-certified surgeon and that he build his open-heart surgery volume to that recommended by the Society of Thoracic Surgery.

Through a March 10, 1995 resolution, the Board of Trustees of Mercy Hospital concluded that second recommendation of the review panel was not in the best interest of future patients to be served by Mercy Hospital "[i]n light of the overwhelming evidence in support of Recommendation I." [8] The resolution set forth several reasons for the board's conclusion: (a) The monitoring process is unlikely to bring about an improvement in Dr. Manzetti's judgment due to his pattern of resistance to constructive suggestions, his continuing to perform surgery for a long period of time notwithstanding extremely low volume levels, and his failure to document fully and completely patient complications raises questions about his credibility and his willingness to put patient interests above his own; (b) his inability to build a volume over the course of the years he has practiced at Mercy suggests that it is unlikely that the panel's recommendation could realistically be expected to result in sufficient volume from which to draw a reasonable conclusion at the end of one year; and (c) there would be an extreme administrative burden and cost imposed on Mercy including the credentialing of the surgeon proposed by Dr. Manzetti and the necessity of ascertaining that the surgeon understands that he or she must place the best interests of Mercy Hospital's patients above any personal obligation owed to Dr. Manzetti; in addition, Mercy will

---

8. This resolution is defendants' exhibit 9 (vol. II).

ultimately bear the risk of liability to patients that cannot be adequately covered by full informed consent by patients or by insurance carried by Dr. Manzetti and the outside surgeon.

On April 3, 1995, Dr. Manzetti and his professional corporation filed a complaint in civil action and for injunctive relief in equity. On August 25, 1995, plaintiffs filed a first amended complaint. This amended complaint names as defendants Mercy Hospital, Edward T. Wenzke, president of Mercy Hospital, and 14 physicians who are members of the medical executive committee and were involved in suspending Dr. Manzetti's privilege and/or provided information to the medical executive committee that, according to the Manzetti complaint, was false and misleading.

Plaintiffs' amended complaint contains 99 counts, including breach of contract claims against Mercy Hospital for initiating, continuing, and upholding Dr. Manzetti's suspension in violation of its bylaws; a claim against Mercy Hospital for injunctive relief in which Dr. Manzetti requests this court to order Mercy Hospital to rescind the suspension and to notify the National Practitioner Data Bank that Dr. Manzetti is competent to perform open-heart surgery; and claims against Mercy Hospital, Mr. Wenzke, and the 14 defendant-physicians for libel, slander and defamation, for tortious interference with present contractual and business relationships, for intentional infliction of emotional distress, for conspiracy to inflict mental and emotional distress, for conspiracy to libel, slander, and defame, and for conspiracy to interfere with present and prospective contractual and business relations.

Dr. Manzetti's claims for monetary relief raised against Mercy Hospital, Mr. Wenzke and each of the physician defendants arise out of these defendants' par-

ticipation in the peer review process in which Dr. Manzetti's privilege to perform open-heart surgery at Mercy Hospital was initially suspended temporarily and thereafter suspended permanently. The federal legislation upon which defendants base their motion for summary judgment was enacted to further peer review activities through which hospitals and staff physicians assist a hospital in selecting and retaining only competent physicians by encouraging physicians to identify other physicians who are not competent. In furtherance of this goal, HCQIA provides limited immunity from liability for money damages to those who participate in professional peer review activities. *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318, 1321 (11th Cir. 1994).

Section 11111(a) of HCQIA provides that if a professional review action meets all of the standards specified in section 11112(a), those participating in the review process "shall not be liable in damages under any law of the United States or of any state" (with certain exceptions that are inapplicable to this lawsuit) with respect to the professional review action.[9] Section 11112(a) reads as follows:

"For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—

"(1) in the reasonable belief that the action was in the furtherance of quality health care,

---

9. This legislation covers only claims for monetary damages; it preserves causes of action for injunctive or declaratory relief by aggrieved physicians. *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d at 1322-23 n.4; *Imperial v. Suburban Hospital Association Inc.,* 37 F.3d 1026, 1031 (4th Cir. 1994).

"(2) after a reasonable effort to obtain the facts of the matter,

"(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

"(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*"A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence."* (emphasis added)

In deciding defendants' motion for summary judgment, I will assume that Dr. Manzetti has raised contract claims for which monetary relief may be awarded under Pennsylvania contract law based on his allegations that Mercy Hospital failed to follow its bylaws in temporarily and permanently suspending Dr. Manzetti's open-heart surgery privilege. I will also assume that Dr. Manzetti has raised tort claims for which monetary relief may be awarded under Pennsylvania tort law. However, each of Dr. Manzetti's claims seeks damages resulting from a professional review action as defined in section 11151(9). Consequently, the immunity provision of section 11111 of HCQIA bars Dr. Manzetti from recovery of any damages if the professional review action met each of the standards of section 11112(a).

I am unaware of any Pennsylvania appellate court case law that has considered sections 11111 and 11112(a). Several federal courts of appeals have considered immunity claims based on these provisions; these cases construe section 11112(a) in a very similar

manner. The court's opinion in *Bryan v. James E. Holmes Regional Medical Center, supra,* is the most comprehensive.

In *Bryan,* a Florida hospital terminated the clinical staff privileges of Dr. Bryan. Dr. Bryan sued the hospital raising various state and federal causes of action. A jury found that the hospital had revoked Dr. Bryan's staff privileges in violation of the hospital's bylaws and awarded him approximately $4.2 million for breach of contract. On appeal, the hospital contended that it was immune from liability for money damages under the HCQIA's immunity provisions. The court of appeals agreed.

Bryan had been a member of the hospital's medical staff since 1976. He was acknowledged to be an excellent surgeon with a volcanic temper. He had a history of verbally abusing nurses, technicians, and other physicians. In October 1989, the hospital's board of directors gave Dr. Bryan what it referred to as a final warning.

On May 18, 1990, the chief of the medical staff suspended Dr. Bryan's clinical privileges pending an investigation of additional incidents that had been reported. On May 29, 1990, the executive committee of the medical staff recommended that Dr. Bryan's staff privileges be revoked permanently. At Dr. Bryan's request, a peer review hearing panel was appointed. There was a lengthy hearing at which Dr. Bryan was represented by counsel. The panel found that Dr. Bryan had demonstrated a pattern of disruptive behavior that had adversely impacted on patient care and recommended a two-year suspension. Following receipt of the hearing panel's report, the executive committee stood by its recommendation of a termination of privileges.

Dr. Bryan appealed the recommendation of the executive committee of the medical staff to the board of directors. The board appointed a board review panel which recommended termination. The full board considered the three recommendations and in November 1990 unanimously voted to terminate permanently Dr. Bryan's clinical privileges. Thereafter, Dr. Bryan instituted the lawsuit that resulted in the jury verdict in his favor.

The jury's verdict was based solely on its answering "yes" to the question of whether the hospital permanently terminated Dr. Bryan's medical staff privileges in violation of its bylaws. The verdict form did not include any reference to federal immunity. Furthermore, the district court had not made a determination that the violation-of-bylaws claim was outside the scope of sections 11111 and 11112(a).

The court of appeals overturned the verdict because it found that the peer review action met the standards of section 11112(a), so section 11111(a) barred recovery under Florida law. The court said that HCQIA immunity is a question for the court to decide and may be resolved whenever the record in a particular case has become sufficiently developed. Congress intended that courts consider the issue of HCQIA immunity from damages at the summary judgment stage. If it is determined that the defendant is not entitled to HCQIA immunity, then the merits of the case should be submitted to the jury without reference to the immunity issue. *Bryan, supra,* 33 F.3d at 1332-33.

In determining whether the defendant is entitled to HCQIA immunity, section 11112(a) contains a rebuttable presumption: "A professional review action shall be presumed to have met the preceding standards [(1)-(4) of section 11112(a)] necessary for the protection set

out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." The court said that this presumption that the professional review action has met the four standards of section 11112(a) creates an unusual summary judgment standard under which the plaintiff must show by a preponderance of the evidence that the defendant's actions are outside the scope of section 11112(a). In other words, it is the plaintiff who bears the burden of proving that the peer review process was not reasonable. *Id.* at 1333.

Furthermore, the "reasonableness" requirements within section 11112(a)(1), (2), and (4) create an objective standard of performance rather than a subjective good faith standard. This test is satisfied if the persons participating in the peer review, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or protect patients. *Id.* at 1323. The intent of the HCQIA is to reinforce the pre-existing reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise. *Id.* at 1337.

The controlling issue, according to the *Bryan* opinion, was whether the professional review action satisfied the four standards of section 11112(a). In determining whether the professional review action met each of these standards, the court reviewed the record of the professional review action using the rebuttable presumption that the professional review action met these four standards and an objective standard in applying the reasonableness requirements.

The court said that the first standard of section 11112(a) is met if the reviewers, with the information available to them at the time of the professional review

action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients. *Id.* at 1334-35. On the basis of the evidence concerning Dr. Bryan's disruptive behavior, the court found that a person participating in the peer review could reasonably have concluded that the revocation of Dr. Bryan's privileges would further quality patient care.

In response to Dr. Bryan's assertion that the members of the board of directors and executive committee were primarily motivated by personal animosity rather than concern for patient care, the court said that these assertions are irrelevant to the reasonableness standards. The test is an objective one, so bad faith is immaterial—the real issue is the sufficiency of the basis for the hospital's actions. *Id.* at 1335.

The court found that the second standard—that there was a reasonable effort to obtain the facts of the matter—was met because each of the groups that was evaluating Dr. Bryan's conduct based its decision on a record developed during the peer review proceedings after Dr. Bryan had the opportunity to make a presentation. The court said that this constitutes a reasonable effort to obtain the facts of the matter.

With respect to the third standard that the review action be taken after adequate notice and hearing procedures or such other procedures that are fair to the physician under the circumstances, the court concluded from a review of the record of the peer review proceedings that a reasonable jury could not find that the hospital had not afforded Dr. Bryan adequate procedures.

With respect to the final requirement that the permanent termination was imposed in the reasonable belief that the action was warranted by the facts known after

a reasonable effort to obtain the facts and after affording procedures that are fair under the circumstances, the court said that the record established that the board of directors had a factual basis for its action and that it did not abuse the broad discretion HCQIA grants to hospital boards with regard to staff privilege decisions in imposing the severe sanction that Dr. Bryan received.

As I previously said, other federal courts of appeals that have considered medical providers' immunity claims based on an assertion that their professional review actions satisfied the standards set forth in section 11112(a) have construed this section in a similar manner.

In *Mathews v. Lancaster General Hospital,* 87 F.3d 624 (3d Cir. 1996), the court of appeals affirmed a district court's entry of summary judgment dismissing the plaintiff's claims for monetary damages based on the immunity provisions of HCQIA. The court of appeals said that section 11112(a)'s presumption that the professional review activity met section 11112(a)'s standards for immunity means that the plaintiff bears the burden of proving that the peer review process was not reasonable. The court said that section 11112(a) mandates an objective standard. Assertions of hostility and bad faith that are unsupported by the record are immaterial. A court should consider the "totality of the circumstances" in determining if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients. *Id.* at 635. A showing that the peer reviewers received conflicting evidence does not rebut the presumption that the decision was made in the good faith belief that it was warranted

unless the evidence upon which the reviewers relied is "so obviously mistaken or inadequate as to make reliance on [it] unreasonable." *Id.* at 638.

*Austin v. McNamara,* 979 F.2d 728 (9th Cir. 1992), considered a damage action brought by a physician whose privileges, after a seven-month suspension, were reinstated based on a report of a review committee which recommended reinstatement. The defendants were the hospital and the physicians involved in the review action that led to the suspension. The lower court entered summary judgment based on the immunity provisions of HCQIA and the court of appeals affirmed.

The plaintiff's staff privileges had been suspended by the hospital's chief of staff after he presented to the hospital's medical executive committee certain of the plaintiff's cases that, according to findings of other neurosurgeons, indicated substandard treatment. The plaintiff then received a hearing before a review committee that issued a report finding that the decision of the medical executive committee to suspend plaintiff was unreasonable. The opinion of the court of appeals stated that the reasonableness requirements of section 11112(a) are intended to create an objective rather than a subjective good faith standard, so the plaintiff's assertion that physicians participating in the initial peer review process were hostile to him is irrelevant. *Id.* at 734. The court noted that the report of the judicial review committee had included criticism of the plaintiff's treatment of one patient and a recommendation that conditions be placed on his practice. In light of this criticism and these recommendations, the court held that the plaintiff would be unable to overcome the presumption that the defendants acted in the reasonable belief that suspension was warranted by the facts known at the time they made the decision to revoke the plain-

tiff's privileges pending the hearing before the judicial review committee that plaintiff had requested.

In *Imperial v. Suburban Hospital Association Inc.,* 37 F.3d 1026 (4th Cir. 1994), a physician who was denied reappointment to the medical staff sued the hospital and doctors involved in its professional peer review activities. The district court granted the defendants' motion for summary judgment based on the HCQIA immunity provisions. The court of appeals affirmed. The plaintiff claimed that the doctors reviewing his performance were not qualified to decide the medical issues because they did not practice in his field and in any event were biased against him. In response to this argument, the court said that "[n]owhere in the record can we find any suggestion that any issue, other than a legitimate health care quality concern, was presented or considered," *(id.* at 1029) and that "even if [the plaintiff] could show that these doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding, that does not meet the burden of contradicting the existence of a *reasonable belief* that they were furthering health care quality in participating in the peer review process." *Id.* at 1030.

In *Smith v. Ricks,* 31 F.3d 1478 (9th Cir. 1994), the court of appeals affirmed the summary judgment entered by the district court pursuant to the immunity provisions of HCQIA in favor of the hospital and physicians involved in a peer review process which resulted in the plaintiff's removal from the staff. This court, citing *Austin, supra,* said that the "reasonableness" requirements of section 11112(a) create an objective standard and that this section's rebuttable presumption creates an unusual standard of review for summary judgment because the inquiry focuses on whether the plaintiff has provided sufficient evidence to permit a jury to

find that he has overcome, by a preponderance of the evidence, the presumption that physicians in the defendants' position would reasonably have believed that their actions were warranted by the facts. *Id.* at 1485. The court ruled that summary judgment was properly entered because the record of the peer review process showed that the hospital conducted a reasonable investigation into the plaintiff's conduct and that the plaintiff failed to rebut the presumption that after reasonable effort to obtain facts and an adequate hearing, the hospital reasonably believed that its action was warranted. In response to the plaintiff's contention that a hospital cannot be immune from liability because its hearings violated state law and the fair procedure guidelines of various professional organizations, the court said that this is irrelevant once the immunity provisions of HCQIA are met. *Id.* at 1487 n.8. Also see, *Crosby v. Hospital Authority of Valdosta,* 873 F. Supp. 1568 (M.D. Ga. 1995); *Monroe v. AMI Hospitals of Texas Inc.,* 877 F. Supp. 1022 (S.D. Tex. 1994); *Goodwich v. Sinai Hospital of Baltimore Inc.* (Md. Ct. Spec. App. 1995).

The peer review actions described in this opinion beginning with the suspension of Dr. Manzetti's privileges on February 11, 1994, and ending with the Board of Trustees' adoption of its March 10, 1995 resolution supporting the decision of the medical executive committee to permanently suspend Dr. Manzetti's open-heart surgery privilege comply with each of the four standards of section 11112(a) of HCQIA as construed by the case law that I have discussed.

The first standard is met because the actions were taken in response to credible evidence presented to Dr. Pellegrini, the medical executive committee, the hearing panel, the review panel and the Board of Trustees of Mercy Hospital that patient safety and care would be

jeopardized if Dr. Manzetti continued to perform open-heart surgery at Mercy Hospital.

There was credible testimony to support a reasonable belief that the volume of Dr. Manzetti's open-heart surgeries was insufficient to maintain an appropriate skill level; that there was no reasonable likelihood that his volume would ever approach the levels recommended by the Society of Thoracic Surgery; that high quality open-heart surgery cannot be performed at Mercy Hospital unless the surgeon employs a physician's assistant who works regularly with the surgeon; that Dr. Manzetti does not have an adequate working relationship with the anesthesiologists, residents and others who are involved in Dr. Manzetti's open-heart surgeries; and that Dr. Manzetti's surgeries are significantly longer and have more complications. These are serious deficiencies and open-heart surgery is life threatening. Consequently, plaintiffs cannot overcome the rebuttable presumption that the revocation of Dr. Manzetti's privilege to perform open-heart surgery was taken in the reasonable belief that this action furthered the quality of health care.

The second standard is met because before each decision was made there was a reasonable effort to obtain the facts of the matter. The medical executive committee obtained the facts that were reasonably available before its initial vote on February 11, 1994 to suspend the open-heart surgery privilege temporarily. Also, at this February 11, 1994 meeting, the committee planned to reconvene within two weeks and outlined an investigation independent of Dr. Pellegrini that would be conducted. At its February 24, 1994 meeting, it considered reports, statistics and interviews that were the product of this investigation. The hearing panel did not act until the medical executive committee and Dr. Manzetti had the full opportunity to present any evidence

that they wished the hearing panel to consider. The review panel acted only after holding an oral argument and reviewing the transcript of the hearing before the hearing panel. The Board of Trustees' resolution states that the board fully considered the report and recommendation of the review panel.

The third standard is met because Dr. Manzetti was represented by counsel and had the opportunity to present whatever testimony he wished to the hearing panel. Furthermore, the medical executive committee presented its testimony on May 14, 1994, and Dr. Manzetti did not present his testimony until October 25-26, 1994. Consequently, for more than five months before he presented his defense, Dr. Manzetti was fully apprised of the charges that the medical executive committee had made against him and the reasons for its decision.[10]

The fourth standard is met because, for the reasons set forth in my discussion of the first standard, the information that was known to the physicians and board members who engaged in the professional review action supports a finding that they reasonably concluded that the suspension of Dr. Manzetti's open-heart surgery privilege was warranted.

---

10. Section 11112(b) is a "safe harbor" provision under which a health care entity is deemed to have met the adequate notice and hearing requirements of subsection (a)(3) if conditions set forth in this provision are met. Even assuming that these conditions were not met, case law holds that there is compliance with the third standard (*i.e.,* subsection (a)(3)) if there is evidence showing that other procedures were followed that were fair to the physician under the circumstances. Moreover, a physician who does not contemporaneously object to the manner in which the hearing is conducted voluntarily waives the right to object. *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d at 1336; *Smith v. Ricks,* 31 F.3d at 1485-87; *Monroe v. AMI Hospitals of Texas Inc.,* 877 F. Supp. at 1030.

For these reasons, I enter the following order of court:

ORDER

On November 12, 1996, it is hereby ordered that defendants' motion for summary judgment as to plaintiffs' claims for damages is granted, and that each of the counts in plaintiffs' first amended complaint other than Count 2 (*Manzetti v. Mercy Hospital*—injunctive relief) is dismissed.