JOHN F. MCLEAY, M.D., APPELLANT AND CROSS-APPELLEE,
v. BERGAN MERCY HEALTH SYSTEMS CORP., DOING
BUSINESS AS BERGAN MERCY MEDICAL CENTER,
APPELLEE AND CROSS-APPELLANT.

708 N.W.2d 592

Filed December 9, 2005.   No. S-04-117.

David S. Houghton and J.P. Sam King, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., for appellant.

P. Shawn McCann, of Sodoro, Daly & Sodoro, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

McCORMACK, J.

## I. NATURE OF CASE

In this appeal, John F. McLeay, M.D., challenges certain actions taken against him by Bergan Mercy Health Systems Corp. (Bergan) preceding Bergan's suspension of McLeay's surgical privileges. The district court granted summary judgment in favor of Bergan, finding that Bergan was immune from liability for damages under the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. § 11101 et seq. (2000). McLeay appeals, and Bergan cross-appeals.

## II. FACTUAL BACKGROUND

McLeay is a general surgeon in Omaha, where he has been a solo practitioner since 1963. He has also been a member of the medical staff at Bergan since that year. At all relevant times, McLeay had general surgical privileges at both Bergan and St. Joseph Hospital.

On or about October 19, 1992, McLeay received a certified letter from Bergan. The letter informed McLeay that an investigation into the medical care he had provided to patients at Bergan had been authorized by a surgery advisory committee. It further stated that "[i]f the peer review process ends with a recommendation that would adversely [a]ffect your clinical privileges or Staff membership, you will be notified of such recommendations and

given notice of your right to a hearing in accordance with the Medical Center's Fair Hearing Plan."

McLeay was next informed about the investigation in a December 2, 1992, letter from Richard Hachten, the president of Bergan. McLeay was informed that a monitoring requirement was immediately being imposed upon his surgical privileges per the recommendation of the medical executive committee. This monitoring required that another surgeon attend any surgical procedure performed by McLeay. The letter further stated that the "monitoring requirement will remain in effect until the corrective action procedure, of which you were previously notified, has been completed in accordance" with Bergan's bylaws. It also stated that McLeay would have an opportunity to meet with an ad hoc review committee investigating the clinical care provided to his patients.

The first communication McLeay received from the ad hoc committee came in a December 23, 1992, letter. The letter invited McLeay to attend a meeting of the ad hoc committee on December 29. The letter informed McLeay that at the meeting, he would be "informed of the general nature of the information and will be given an opportunity to discuss it with the Committee." The letter also stated that "[t]he meeting is informal. It is not a hearing and none of the rules concerning hearings outlined in the Bylaws apply to this meeting."

Present at the December 29, 1992, meeting were Drs. Dwaine Peetz and Daniel McKinney. The third member of the committee, Dr. Richard Feldhaus, was not present. At the meeting, McLeay first became aware of the subject of the investigation— medical care he had previously provided to eight patients (the eight cases). The committee asked McLeay about the care he provided in the eight cases, and McLeay was able to review some records from the eight cases.

McLeay next heard from the ad hoc committee when Peetz telephoned him on January 7, 1993, and asked McLeay to meet with the committee the next day. At the meeting, they discussed the eight cases and the monitoring requirement. McLeay was also given a list of five minor procedures that he could perform without a monitor. According to McLeay, the committee also agreed to later provide a "laundry list" of outpatient surgical

procedures that would also be exempted from the monitoring requirement. Several months later, Hachten informed McLeay that his request to receive a "laundry list" of exempted procedures had been denied.

McLeay testified that he was told by the ad hoc committee that the monitoring requirement would be in effect for 6 to 12 months, after which time, McLeay could apply for reinstatement. Minutes of the January 7, 1993, meeting stated that the minutes were privileged communications and not subject to disclosure under Nebraska law. The minutes memorialized the monitoring requirement and also stated that McLeay would be removed from the call list for the emergency medicine department. The minutes were signed by McLeay.

The matter then went to the medical executive committee. The medical executive committee approved the monitoring requirement and four minor procedures excluded from the monitoring requirement. The minutes of the medical executive committee were signed by McLeay. Bergan's board of directors approved the agreement between McLeay and the ad hoc committee, as supplemented by the medical executive committee.

On February 26, 1993, McLeay received a letter from Bergan. It informed McLeay that the hospital had submitted a report to the "National Practitioner Data Bank" (databank). McLeay testified that prior to receiving this letter, the databank had never been raised as a topic in any of his discussions with the hospital. The report submitted to the databank indicated that a monitoring requirement had been imposed on McLeay's surgical procedures. The report indicated that the duration of the action taken by Bergan was indefinite and constituted a reduction of clinical privileges for "Incompetence/Malpractice/Negligence."

On December 2, 1993, 1 year after the monitoring requirement had been imposed on his surgical procedures, McLeay sent a letter to Peetz requesting reinstatement. On June 1, 1994, McLeay was informed that Bergan's board of directors decided not to remove the monitoring requirement but did direct that criteria be established so that McLeay could work toward removing the monitoring requirement. McLeay was never notified of any such criteria.

During the afternoon of December 9, 1994, McLeay received a telephone call from Feldhaus saying that Feldhaus and Hachten wanted to meet with McLeay that afternoon and talk about McLeay's privileges. McLeay insisted on having counsel present at the meeting. Five minutes later, Hachten telephoned McLeay and told him that his privileges at Bergan were being suspended because of additional information regarding McLeay's care of a patient in July 1991.

On December 13, 1994, McLeay received a letter from Hachten. As reasons for the suspension, the letter mentioned the eight cases as well as several new cases McLeay had never previously heard concerns about. On February 8, 1995, Bergan reported McLeay's suspension to the databank, again indicating that it was for "Incompetence/Malpractice/Negligence" and for an indefinite duration.

### III. PROCEDURAL BACKGROUND

McLeay initially filed a petition against Bergan on January 6, 1995. A jury trial was held in November 1998. The jury was instructed on two counts: breach of contract and breach of Bergan's bylaws. The jury returned a verdict in favor of McLeay in the amount of $451,000 on the breach of contract claim and $1 on the breach of bylaws claim. Bergan appealed the verdict to the Nebraska Court of Appeals, which vacated the verdict, reversed the judgment, and remanded the cause because of the erroneous admission of expert testimony. *McLeay v. Bergan Mercy Health Sys.*, No. A-99-474, 2001 WL 185263 (Neb. App. Feb. 27, 2001) (not designated for permanent publication).

On remand, McLeay filed the operative petition against Bergan on May 22, 2002. It included separate causes of action for breach of contract, fraudulent representation, fraudulent concealment, negligent misrepresentation, and mutual mistake. It also included, for the first time, a claim for defamation. More specifically as it relates to his defamation claim, McLeay alleged two separate instances of defamatory statements made by Bergan: the report filed with the databank on February 22, 1993, and the report filed with the databank on February 8, 1995.

Bergan demurred to the petition, asserting, among other things, that McLeay's defamation claim was barred by the

statute of limitations. The district court sustained the demurrer as to the 1993 databank report, but overruled the demurrer as to the 1995 databank report.

Each party filed a motion for summary judgment. At the summary judgment hearing, the entire record from the 1998 jury trial was received into evidence. The district court sustained Bergan's motion for summary judgment and denied McLeay's motion for summary judgment, finding that Bergan was immune from any liability for damages under the HCQIA. McLeay appeals, and Bergan cross-appeals. We moved the case to our docket.

## IV. ASSIGNMENTS OF ERROR

McLeay assigns that the district court erred in (1) finding that Bergan was entitled to immunity under HCQIA; (2) finding that McLeay waived his claims against Bergan; (3) failing to find that Bergan's reports to the databank were false and that therefore, Bergan was not entitled to immunity under HCQIA; (4) determining as a matter of law that Bergan was required to report the monitoring requirement to the databank; (5) finding that there was no evidence of malice regarding Bergan's submission of its second report to the databank; and (6) failing to find that Bergan was not immune under HCQIA from McLeay's claims for equitable relief.

On cross-appeal, Bergan assigns that the district court erred in overruling its demurrer and summary judgment motion on the February 8, 1995, report to the databank on the ground that this defamation claim was barred by the statute of limitations.

## V. STANDARD OF REVIEW

■ Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Hans v. Lucas, ante* p. 421, 703 N.W.2d 880 (2005); *Eicher v. Mid America Fin. Invest. Corp., ante* p. 370, 702 N.W.2d 792 (2005).

■ In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the

benefit of all reasonable inferences deducible from the evidence. *Spear T Ranch v. Nebraska Dept. of Nat. Resources, ante* p. 130, 699 N.W.2d 379 (2005); *Fraternal Order of Police v. County of Douglas, ante* p. 118, 699 N.W.2d 820 (2005).

## VI. ANALYSIS

### 1. HCQIA IMMUNITY WITH REGARD TO PEER REVIEW PROCESS

In his first assignment of error, McLeay claims that the district court erred in granting summary judgment in favor of Bergan because Bergan was entitled to immunity under HCQIA. We agree.

■ HCQIA was enacted to " 'encourag[e] physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior.' " *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318, 1321 (11th Cir. 1994). The process by which physicians and hospitals evaluate and discipline staff doctors is the peer review process. In furtherance of its purpose, HCQIA grants limited immunity in suits brought by disciplined physicians from liability for money damages to those who participate in professional peer review actions, as that term is defined in HCQIA. 42 U.S.C. § 11111(a). Whether an entity or individual is entitled to HCQIA immunity is a question of law for the court to decide and may be resolved whenever the record becomes sufficiently developed. See *id.*

To avail itself of the immunity granted by HCQIA, the professional review action by a professional review body must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).

A professional review action is defined in HCQIA as

> an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges . . . of the physician.

42 U.S.C. § 11151(9). The monitoring requirement imposed on McLeay falls within this definition. Likewise, there is no dispute that Bergan is a "professional review body," as that term is defined in § 11151(11).

As explained by both the 9th and 11th Circuit Courts of Appeals, HCQIA reverses the normal burden of proof and establishes a presumption that the professional review action has met the four standards of § 11112(a) unless the presumption is rebutted by a preponderance of the evidence. "In a sense, the presumption language in HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable." (Emphasis in original.) *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d at 1333. Thus, we must consider in the instant case whether McLeay " 'provided sufficient evidence to permit a jury to find that he ha[d] overcome, by a preponderance of the evidence, the presumption' " that Bergan " 'would reasonably have believed' that it had met the standards of section 11112(a)." See *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318, 1334 (11th Cir. 1994). Accord *Austin v. McNamara*, 979 F.2d 728 (9th Cir. 1992). If not, Bergan's motion for summary judgment was properly granted.

Section 11112(a)(1) of the HCQIA immunity test is satisfied if " 'the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients.' " *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d at 1334-35.

McLeay offered the deposition testimony of Drs. Anthony Pantano and James Mailliard. Each doctor either reviewed the medical files for the eight cases that instigated the investigation into McLeay's surgical procedures or assisted McLeay during

his care of those patients. Each testified that the care provided by McLeay was consistent with the appropriate standards of care and that McLeay did nothing that would merit any disciplinary action taken against him.

Viewing this evidence in the light most favorable to McLeay and giving McLeay the benefit of all reasonable inferences, we conclude that there is a genuine issue of material fact as to whether Bergan imposed the monitoring requirement in the reasonable belief that it was in furtherance of quality health care. The record is entirely silent on the reasonable belief which formed the basis for imposing the monitoring requirement. Although the record indicates that an investigation was initiated because of concerns regarding the care McLeay provided in the eight cases, it fails to indicate how McLeay's performance was deficient or what allegations were made against him. Thus, there is nothing in the record to establish that Bergan had a reasonable belief the monitoring requirement would further quality health care in light of the contrary testimony of Pantano and Mailliard.

Having determined that there is an issue of material fact as to whether Bergan's actions satisfied the first requirement of § 11112(a), we need not determine whether McLeay met his burden with regard to the remaining requirements of that section. Because a question of fact exists with regard to the first requirement of § 11112(a), we conclude that the district court erred in granting summary judgment in favor of Bergan on the issue of Bergan's immunity under that section.

## 2. DATABANK REPORTS

McLeay's third through sixth causes of action relate to Bergan's 1993 and 1995 reports to the databank.

### (a) 1993 Databank Report

Pursuant to 42 U.S.C. § 11133(a)(1), "Each health care entity which—(A) takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days . . . shall report to the Board of Medical Examiners, in accordance with section 11134(a) of this title, the information described in paragraph (3)." Immunity for submitting reports to the databank under § 11134 is provided for in § 11137(c), which

provides: "No person or entity . . . shall be held liable in any civil action with respect to any report made under this subchapter (including information provided under subsection (a) of this section[)] without knowledge of the falsity of the information contained in the report."

As we stated above, the monitoring requirement imposed on McLeay's surgical procedures in December 1992 was a professional review action, which is defined in part as an action that adversely affects a physician's clinical privileges. See § 11151(9). Thus, under § 11133(a), Bergan was required to report the monitoring requirement to the databank.

■ The district court, with regard to the 1993 report to the databank, determined that any claims in regard to this report were barred by the statute of limitations. Although McLeay's assignments of error with regard to the 1993 report do not directly address the district court's ruling on this report, we will determine whether the granting of that demurrer was correct prior to addressing McLeay's assignments of error. The 1993 report was filed on February 22, 1993. The first claim made by McLeay in regard to this report was asserted in his amended petition filed 9 years later on May 22, 2002. The statute of limitations as set forth in Neb. Rev. Stat. § 25-208 (Cum. Supp. 2004) is 2 years. As such, the district court was correct in sustaining Bergan's demurrer to McLeay's causes of action relating to the 1993 report to the databank. It is not necessary, therefore, to address McLeay's assignments of error in this regard. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *Gary's Implement v. Bridgeport Tractor Parts, ante* p. 286, 702 N.W.2d 355 (2005).

(b) 1995 Databank Report

We next address Bergan's claim on cross-appeal that the district court erred in failing to grant Bergan's demurrer and motion for summary judgment of McLeay's defamation cause of action, based on Bergan's filing of an allegedly false report to the databank on February 8, 1995. McLeay asserts that this claim, filed for the first time in his amended petition in May 2002, relates back to the original petition, which was filed in January 1995. We note that the facts giving rise to this claim

occurred after the filing of the original petition. The record does not reveal that there was any claim made for any defamation prior to the May 2002 amended petition. Thus, the issue presented is whether a claim can relate back to a petition which predates the action or actions giving rise to the claim. We have not previously addressed this.

In *Gelbard v. Bodary*, 270 A.D.2d 866, 706 N.Y.S.2d 801 (2000), a physician brought a defamation action against a member of the peer review committee of the hospital where the physician's staff privileges were revoked. The *Gelbard* court held that to the extent a peer review committee member's statement to the hospital's ad hoc review committee allegedly contained new and distinct slander, a claim based on those statements did not relate back to the original complaint for statute of limitations purposes, because the original complaint did not give notice of the transaction or occurrence or series of transactions or occurrences to be proved pursuant to a new slander claim.

In *Hill v. Heritage Resources, Inc.*, 964 S.W.2d 89 (Tex. App. 1997), the Texas Court of Appeals held that claims in an oil and gas operator's amended petition for tortious interference with a prospective business relationship and slander of title respecting the operator's alleged transactions with third parties to sell oil and gas did not exist when the operator filed the original petition. Thus, the claims did not relate back to the date of the original petition for limitations purposes in an action against working interest owners where the operator filed the original petition before the transactions came into existence.

Similarly, in *Fikes v. Furst*, 133 N.M. 146, 61 P.3d 855 (N.M. App. 2002), *reversed in part on other grounds* 134 N.M. 602, 81 P.3d 545 (2003), a defamation action brought by a professor against another professor, the New Mexico Court of Appeals held that an amended complaint did not relate back to the date the original complaint was filed for statute of limitations purposes where the amended complaint cited facts, conduct, and injuries not alleged in the original complaint. In *Fikes*, the original complaint set forth the following alleged defamatory statements: The plaintiff was not qualified to work on a certain research project, the university where the plaintiff had earned his doctoral degree had " 'disowned' " the plaintiff, the university

" 'didn't want anything to do with him,' " and the university was " 'sorry [it] had ever given him or provided him with a doctor's degree.' " 133 N.M. at 156, 61 P.3d at 865. The subsequent defamatory statements, which the plaintiff claimed related back to the original complaint, were that the plaintiff was a " 'lousy anthropologist,' " that he was " 'incapable of doing a competent job on [a certain] manuscript,' " that he was " 'paranoid,' " that he committed unethical and professional misconduct, and that he was racist. *Id.* at 151, 61 P.3d at 860.

We agree with the decisions of these courts and likewise conclude that because the alleged defamation regarding the 1995 report by Bergan to the databank occurred after the original petition was filed, the claim could not relate back to that petition. Since the claim could not relate back to the original petition, the claim with regard to the report to the databank of February 8, 1995, was first raised in the amended petition filed May 22, 2002. As such, the claim is barred by the statute of limitations. See § 25-208. The district court, therefore, erred in not granting Bergan's demurrer to that portion of the amended petition claiming defamation as a result of Bergan's 1995 report to the databank.

### 3. WAIVER

In his second assignment of error, McLeay argues that the district court erred in finding that he had waived his claims against Bergan. In its December 24, 2003, order, the district court found that at the time McLeay's clinical privileges were suspended, he received notice of the reasons and was given an opportunity to be heard and have a hearing. McLeay requested a hearing, and the hearing was set for March 9, 1994. McLeay subsequently requested that the hearing be postponed, and it was never rescheduled. Pursuant to *Babcock v. Saint Francis Med. Ctr.*, 4 Neb. App. 362, 543 N.W.2d 749 (1996), the physician waives the requirement that the enumerated conditions under § 11112(b) be followed if the physician fails to object to the notice of hearing procedures. The district court did not make any finding as to the effect of the failure to reschedule the hearing.

The district court found that McLeay "voluntarily and without objection agreed to the recommendations of the ad hoc

committee." McLeay claims the recommendation of the ad hoc committee was on the condition that he was to receive a "laundry list" of exempted procedures which he could perform and that the monitoring requirement would be in effect only for 6 to 12 months. Since there is a factual dispute as to what McLeay agreed to with regard to the ad hoc committee recommendation, there is a genuine issue of material fact which precludes summary judgment on the waiver issue.

## VII. CONCLUSION

We conclude that the district court erred in determining that Bergan was entitled to immunity under HCQIA and in granting summary judgment in favor of Bergan. Because there remain disputed issues of fact concerning HCQIA immunity, we remand the cause to the district court for further proceedings. However, because the issue of immunity is a question of law, "[u]nder no circumstances should the ultimate question of whether the defendant is immune from monetary liability under HCQIA be submitted to the jury." See *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318, 1333 (11th Cir. 1994). If the cause proceeds to trial and a jury returns a verdict awarding damages to McLeay but the evidence conclusively demonstrates that Bergan satisfied HCQIA standards for peer review procedures, then the court should grant posttrial judgment as a matter of law upon a proper motion. See *Bryan v. James E. Holmes Regional Medical Center, supra.*

We further conclude that the district court correctly sustained Bergan's demurrer on McLeay's claims relating to the 1993 report of McLeay's monitoring requirement to the databank. We also conclude that the district court erred in failing to grant Bergan's demurrer to that portion of the amended petition claiming defamation relating to the 1995 report to the databank, and we remand the cause to the district court with instructions to sustain Bergan's demurrer relating to the 1995 report to the databank.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

GERRARD, J., concurs in the result.